**In re ACUSHNET RIVER & NEW BEDFORD HARBOR: PROCEEDINGS RE ALLEGED PCB POLLUTION.**

Civ. A. No. 83–3882–Y.

United States District Court,
D. Massachusetts.

Feb. 27, 1989.

Ellen M. Mahan, William D. Brighton, Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., and Martha Sosman, Chief, Civil Div., U.S. Attys. Office, Boston, Mass., for U.S.

Lee Breckenridge, Chief, and Nancy Preis, Asst. Attys. Gen., Environmental Protection Div., Dept. of the Atty. Gen., Boston, Mass., for Com. of Mass.

Charles C. Bering, Office of Regional Counsel, U.S. EPA—Region I, Boston, Mass., and Alice Crowe, OECM—Waste, LE 134S, Washington, D.C., for U.S.E.P.A.

Hugh Schratwieser, Office of General Counsel, Washington, D.C., for Nat. Oceanic and Atmospheric Admin.

Daniel J. Gleason, Mary K. Ryan and Brian T. Kenner, Nutter, McClennan & Fish, Boston, Mass., for AVX Corp.

Paul B. Galvani and Roscoe Trimmier, Jr., Ropes & Gray, Boston, Mass., for Aerovox, Inc.

David A. McLaughlin and Michael J. McGlone, McLaughlin & Folan, New Bedford, Mass., for Belleville Industries, Inc.

Verne Vance, Jr., and Richard W. Benka, Foley, Hoag & Eliot, Boston, Mass., for Cornell Dubilier Electronics Co., Inc.

John R. Quarles and Howard T. Weir, Morgan, Lewis & Bockius, Washington, D.C., for Federal Pacific Elec. Co.

Robert J. Muldoon, Jr., Daniel B. Winslow and Barbara O'Donnell, Sherin & Lodgen, Boston, Mass., for Aerovox, Inc. (Ins. Litigation).

William M. Savino and Gary D. Centola, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., Cynthia J. Cohen and Michael B. Bogdanow, Meehan, Boyle & Cohen, Boston, Mass., for Firemen's Fund Ins. Co.

James L. Ackerman, Day, Berry & Howard, Boston, Mass., and Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for Aetna Cas. and Sur. Co.

John P. Ryan, Sloan & Walsh, Boston, Mass., for Hartford Ins. Co.

Michael S. Greco and Lisa D. Campolo, Hill & Barlow, Boston, Mass., and Timothy C. Russell and T. Andrew Culbert, Drinker, Biddle & Reath, Washington, D.C., for Lumbermen's Mut. Cas. Co. and American Motorists Ins.

Stephen J. Paris and Michael F. Aylward, Morrison, Mahoney & Miller, Boston, Mass., for CNA Ins. Co. and Reliance Ins. Co.

Roger E. Warin, Stephen A. Fennell and Anita G. Raby, Steptoe & Johnson, Washington, D.C., for Highlands Ins. Co.

Wm. Gerald McElroy, Jr. and John T. Harding, Jr., Zelle & Larson, Waltham, Mass., for Employers Ins. of Wausau.

James P. Whitters, III, Gaston & Snow, Boston, Mass., for Liberty Mutual Ins. Co.

Bert J. Capone and Deborah S. Griffin, Peabody & Arnold, Boston, Mass., for Home Ins. Co. and Lexington Ins. Group.

Robert F. Corliss and Robert A. Romero, Jr., Corliss & Romero, Boston, Mass., and Mary Ann D'Amato and Paul Moran, Mendes & Mount, New York City, for Underwriters at Lloyd's.

Pamela C. Slater and Allan E. Taylor, Taylor, Anderson & Travers, Boston, Mass., for First State Ins. Co.

Timothy P. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for Mission Ins. Co.

Calum B. Anderson, Parker, Coulter, Daley & White, Boston, Mass., for Northbrook Excess & Surplus Ins. Co.

Carl K. King and Gayle M. Merling, Goldstein & Manello, Boston, Mass., for EPEC, Inc.

David P. Rosenblatt, Burns & Levinson, Boston, Mass., for Plating Technologies.

Erik D. Olson, Counsel, Nat. Wildlife Federation, Washington, D.C., for Nat. Wildlife Federation.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

This memorandum continues the legal discussion commenced in *Acushnet River and New Bedford Harbor: Proceedings Re Alleged PCB Pollution*, 675 F.Supp. 22 (D.Mass.1987). The first opinion dealt primarily with the parties in these related actions and discussed the jurisdiction of the Court, the propriety of the actions commenced by the United States and the Commonwealth of Massachusetts (the "sovereigns"), and the capacity of one of the defendants Belleville Industries, Inc. ("Belleville") to sue and be sued.

With these matters squared away, it is appropriate to turn to the manner in which the trial will actually be conducted, specifically the right to a trial by jury.

### I. *Background of the Jury Claim*

It is clear that Congress, in enacting the Comprehensive Environmental Compensation and Liability Act ("CERCLA"), did not statutorily provide individuals charged under its provisions with a right to a jury trial. Congress has given the executive branch sweeping administrative powers to identify environmentally hazardous waste sites and administratively to assess clean up costs against the widest array of responsible parties. 42 U.S.C. sec. 9607. Indeed, it would appear that Congress desired judicial involvement kept to a minimum. In broad brush, CERCLA enforcement proceedings ought normally progress through an administrative stage in which an environmental hazard is identified, a cost effective plan adopted to deal with it, and those costs assessed against the responsible parties. 42 U.S.C. sec. 9601 *et seq.* In part, the judicial power comes into play if there is a dispute as to who the responsible parties are, if the responsible parties fail to own up or if, *after* the clean up takes place, injury to natural resources remains despite the clean up and a settlement cannot be reached. *Id.*[1]

In theory, that is the way this case should have been handled. In practice, the sovereigns here have not paid the remotest heed to this natural progression. Instead, admittedly concerned about the loss of rights under the three-year statute of limitations embodied in CERCLA's original form, 42 U.S.C. sec. 9612(d), they commenced this litigation on December 10, 1983, without any prior notice to the parties allegedly liable. *See In re Acushnet River*, 675 F.Supp. at 26. Such litigation was commenced at a time when it was not known whether any clean up of the Acushnet River and New Bedford Harbor was feasible or, if feasible, what form it would take and, indeed, well before the promulgation of the regulations governing the determination of an approach to clean up

---

[1] In the face of an imminent threat of harm to the environment, however, the equitable powers of the United States District Court may be invoked at once. 42 U.S.C. sec. 9606.

and the assessment of clean up costs.[2] Even so, the sovereigns sought by this litigation both clean up costs and natural resource damages as well as recovery under a host of related environmental statutes. *In re Acushnet River,* 675 F.Supp. at 25–26.

Not surprisingly, but for preliminary skirmishing, this litigation languished until these related cases were among the oldest and most stale on the Court's docket. In 1985, the Court intervened and attempted to move the cases to trial. "Impossible," said all the litigants but Belleville, "why, given the snail's pace at which our society has come to accept administrative determinations, it may be *years* before the most effective way to clean the harbor up and a cost assessment associated with such clean up can be ascertained, thus allowing this litigation to proceed."[3] Belleville, however, took an independent tack, arguing that, as the litigation was then (in 1985) next in line for trial, the Court ought simply call the case and, when the sovereigns proved unable to go forward with proof of their charges, ought dismiss the litigation with prejudice for want of prosecution. The Court demurred, considering it an abuse of discretion to impose a substantive result upon the fortuity that the Court had suddenly turned its attention to the case.

Balked at such a quick disposition of this action, Belleville reminded the Court that it

sought a trial by jury as to the disputed factual issues raised herein. Given the overlapping factual nexus of these cases, any jury issue must necessarily be resolved first so that the jury's factual determinations may control the findings of this Court in equity. *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959). Although only Belleville had claimed a right to a trial by jury in these related actions, the sovereigns and the other parties have treated Belleville's claim as though it were made in each of the related substantive actions. (Docket Nos. 83–3882, 83–3899.)[4] The sovereigns, however, framed a thoughtful motion to strike Belleville's jury demand in its entirety. On March 27, 1986, after argument, the Court denied this motion from the bench in what has come to be known familiarly in the First Circuit as an *ore tenus* decision.[5] The Court's ruling was limited to natural resource damage claims under 42 U.S.C. sec. 9607(a)(4)(C). The other aspects of the motion were taken under advisement. This opinion sets out the Court's decision as to the right to a jury trial with respect to each of the claims made.

## II. *Jury Trial as of Right—Federal Claims*

■ The Seventh Amendment provides that in "suits at common law, where the

---

**2.** The relevant regulations were not promulgated until September 2, 1986,—nearly three years after this action was commenced, the remedial investigation and feasibility study (the "Study") continues to drag on—the results are not expected until late 1989, and "we will not know for some time what remedy will be selected and, therefore, what injuries to natural resources will remain after the remedy is implemented." Remarks of F. Henry Habicht II, Assistant Attorney General for the Land and Natural Resources Division, Department of Justice, delivered at the Third Annual Hazardous Waste Symposium, October 20–21, 1986.

**3.** This is, of course, but a paraphrase (albeit an impressionistically accurate one) of the arguments made by both the sovereigns and all defendants but Belleville. True, Aerovox, Inc. ("Aerovox") orally moved to dismiss on the ground the litigation was premature but, at the time the sovereigns commenced this litigation, they had every right to proceed and the oral

motion was never seriously pressed. As the oral motion is without merit, it is denied.

**4.** No jury trial has been claimed in the related insurance actions and these cases, Docket Nos. 84–2043–Y, 84–2676–Y, 85–2044–Y, 85–2240–Y, 85–2842–Y, all of which carry the consolidated Docket No. 83–3882–Y, will be tried to the Court in the afternoons following the morning trial of the substantive actions to which they severally relate.

**5.** *Mele v. Fitchburg District Court,* 850 F.2d 817, 819 (1st Cir.1988); *Pignato v. Dien Host, Inc. (In re Dien Host, Inc.),* 835 F.2d 402, 404 (1st Cir. 1987); *Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 23 (1st Cir.1987); *Federal Trade Comm. v. Standard Financial Mgmt. Corp.,* 830 F.2d 404, 409 n. 5 (1st Cir.1987); *Curran v. Department of Justice,* 813 F.2d 473, 476 (1st Cir.1987); *Irons v. Federal Bureau of Investigation,* 811 F.2d 681, 683 (1st Cir.1987); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 744 n. 1 (1st Cir.1985).

value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Amendment does not create, but only preserves jury trial rights. It is often said that the right preserved is the right to a jury trial as it existed in 1791, the year in which the Seventh Amendment was adopted. *See Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935); *Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974). But that does not mean the right is limited to recognized common law forms of action. Instead, the Supreme Court has interpreted "common law" to mean:

> [N]ot merely suits, which the *common law* recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies administered.... In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights.

*Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830) (Story, J.) (emphasis added).

Justice Story's analysis of the Seventh Amendment has proved durable, and to this day the right to a civil jury depends on the distinction between legal and equitable rights. In one respect, however, the holding of *Parsons* has been modified. Where that case spoke of "suits" in which legal rights were asserted, it is now clear that it is not the suit, but the particular issues within a suit upon which the determination will depend: "The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." (footnote omitted). *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970). Thus, the right to a jury trial must remain inviolate

even though the legal issues in a case might be characterized as "incidental" to equitable issues. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 473, 82 S.Ct. 894, 897, 8 L.Ed.2d 44 (1962). Likewise, where an issue is common to both legal and equitable claims, that common issue must be tried first to a jury, except under "the most imperative circumstances." *Beacon Theatres*, 359 U.S. at 510–11, 79 S.Ct. at 956–57.

This same analysis—distinguishing between legal and equitable issues—applies to statutorily created causes of action. *Curtis v. Loether*, 415 U.S. at 194, 94 S.Ct. at 1008. Where Congress has not expressly provided for a civil jury in the statute, as is the case with CERCLA, "a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." (footnote omitted). *Id.* at 195, 94 S.Ct. at 1009; *Pernell v. Southall Realty*, 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974); *see generally*, 9 C. Wright & A. Miller, *Federal Practice & Procedure* sec. 2302 at 16 (1st ed. 1971) ("If a new cause of action is created by Congress, and nothing is said about the mode of trial, the court must look to the nearest historical analogy to decide whether there is a right to a jury.").

As the Supreme Court stated in *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935), "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." Accordingly, this Court must carefully analyze this case to determine whether the sovereigns' complaints present any legal issues. From the above analysis, it is clear that if the answer to this question is "yes," those issues must be tried to a jury. If such issues are common to both legal and equitable claims, any equitable action by the Court must await the jury's verdict.[6]

---

**6.** Although no motion for preliminary injunctive relief has been made, the United States seeks injunctive relief under sec. 106 of CERCLA [42 U.S.C. 9606], sec. 7003 of Title 42 U.S.C., sec. 504 of the Clear Water Act, and sec. 13 of the Rivers & Harbors Appropriation Act of 1899, in the form of an order requiring defendants to take whatever action is necessary to abate the

For the reasons discussed below, the Court rules that the Seventh Amendment requires, at a bare minimum, that the issues underlying the natural resource damage claims must be tried to a jury.

CERCLA provides, in part, that owners and operators of facilities from which there are releases or threatened releases which cause the incurrence of response costs, shall be liable for:

    (A) All costs of removal or remedial action incurred by the United States or a state . . . ; and

    (C) Damages for injury to, destruction of, or loss of natural resources, including the reasonable cost of assessing such injury, destruction, or loss resulting from such a release.

42 U.S.C. sec. 9607(a)(4)(A), (C). (For the sake of brevity, these clauses will be referred to here simply as subsections [A] and [C].) In this case, the United States and the Commonwealth of Massachusetts seek recovery for damages to New Bedford Harbor as trustees of the natural resources in the public domain. Under CERCLA, the sums they recover "shall be available for use to restore, rehabilitate or acquire the equivalent of such natural resources . . . , but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources." 42 U.S.C. sec. 9607(f)(1). Because the condition of the harbor after clean up cannot be ascertained at this time, the relationship between the recovery allowed in subsections (A) and (C) is not yet clear in this litigation. However, the United States and the Commonwealth have stated that their claims for natural resource damages are not limited to the costs incurred in responding to the contamination. In addition, the sovereigns seek damages for the diminished value of the resources and their lost use over time.

At the time of this Court's *ore tenus* decision, two other courts had occasion to consider whether claims for natural re-

source damages should be tried to a jury as matter of right. In *United States v. Wade*, 653 F.Supp. 11 (E.D.Pa.1984), the court allowed a motion to strike the jury demand of the defendants in a CERCLA action. In that case the Commonwealth of Pennsylvania stated that the recovery it sought was limited to "the extent that it ha[d] spent funds in assessing any injury to natural resources or rehabilitating or restoring injured resources." *Id.* at 13. The court held that "[s]uch relief would properly be characterized as equitable for the same reasons that recovery of sec. 107(2), (3)(A) [sic][7] response costs is considered equitable." *Id.* Although the issue may not have been raised in *Wade*, in fact the recovery sought in that case seems to be recompensable under the "response costs" section of the statute, 107(a)(4)(A) [42 U.S.C. sec. 9607(a)(4)(A) ], as opposed to the natural resource damages section, 107(a)(4)(C), [42 U.S.C. sec. 9607(a)(4)(C) ]. Rehabilitation or restoration of natural resources and the reasonable costs incurred in assessing the restoration seem to fall squarely within the response costs category of 107(a)(4)(A) [42 U.S.C. sec. 9607(a)(4)(A) ], whereas claims for the value of the resources that are forever lost, (calculated by taking the value of the resources as they were before the pollution and subtracting the value of the resources after restoration is complete); the lost use of such resources over time; and the costs of assessing how much is lost forever or how much lost use over time there has been, fall under "natural resource damages". 107(a)(4)(C) [42 U.S.C. sec. 9607(a)(4)(C) ].

In *United States v. Allied Chemical Corp.*, No. 83–5898 SC, slip op. (N.D.Cal. September 14, 1984), the court agreed that a claim for recovery of response costs was equitable in nature and did not carry with it a right to a jury trial. *Id.* at 3. The court held, however, that the defendants in that case were entitled to a jury trial because the United States sought additional

---

contamination of the New Bedford Harbor. The Commonwealth seeks similar relief under the common law of public nuisance and strict liability.

**7.** This Court assumes that the court in *Wade* is referring to 42 U.S.C. sec. 9607(a)(4)(A).

damages for "loss of or injury to its property." *Id.* at 3. Similarly, the defendants' demand for a jury on the government's nuisance and trespass claims was upheld because both claims sought damages in addition to cost recovery. *Id.* at 4.

The issue whether defendants in this case have a right to a jury trial is determined by whether the relief sought by the plaintiffs is equitable or legal. An action for natural resource damages under subsection (C), like an action for damages under sec. 812 of the Civil Rights Act of 1968, "sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for injury caused by the defendant's wrongful breach." *Curtis v. Loether*, 415 U.S. at 195, 94 S.Ct. at 1009. Indeed, the analogy to the common law is even stronger here than it was in *Curtis* since the legal duty found in CERCLA is only "new" as a matter of federal law. The common law has long recognized a duty not to injure the property of another. On more than one occasion the Supreme Court has thought it "unmistakeabl[e]" that an action to recover for injury to property is triable to a jury. *See Ross v. Bernhard*, 396 U.S. at 533, 90 S.Ct. at 735; *Pernell v. Southall Realty*, 416 U.S. at 370, 94 S.Ct. at 1727. In the case before this Court the United States and the Commonwealth are suing, albeit under a statute, for injury to the property over which they hold trusteeship. Such injury allegedly was caused by the release of polychlorinated biphenyls ("PCBs"). From these allegations a money judgment might well have been had at common law under either a nuisance or trespass theory. Indeed, the damages sought here, diminution in value and loss of use, are precisely the type a common law court could award. *See W. Prosser and W. Keeton on the Law of Torts* sec. 89 at 637–40 (5th ed. 1984). Accordingly, this Court rules that the claims for the value of the natural resources damages that are forever lost, the value of the lost use of such resources over time and the costs of assessing how much is lost forever or how much lost use there has been over time ("natural resource damages") present legal issues that must be tried to a jury as matter of right.[8]

The United States and the Commonwealth argue that the claims for the value of the contaminated resources that are lost forever and their lost use over time, although "distinct from the request for [recovery of response costs], are similarly equitable in nature." Plaintiffs' Memorandum in Support of Motion to Strike Jury Claim at 14. With all due respect, the conclusion of that argument does not flow logically from its premise. The statute authorizes a money judgment for damages to natural resources, and the amount of those damages is not limited by what is needed to restore or replace the resources. Where a money judgment is sought the action is very frequently one to enforce legal rights. *Dairy Queen v. Wood*, 369 U.S. at 476, 82 S.Ct. at 899; *Ross v. Bernhard*, 396 U.S. at 542, 90 S.Ct. at 956.

The United States urges this Court to hold that the monetary recovery authorized by CERCLA for injury to natural resources is an integral part of the equitable remedy of restitution. The analogy is drawn to back pay authorized by Title VII of the Civil Rights Act of 1964, which has been held to be an integral part of the equitable remedy of making a person whole. *See e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 408–25, 95 S.Ct. 2362, 2367–75, 45 L.Ed.2d 280 (1975). The analogy is unavailing. A comparison of the language of the two statutes makes this plain. When a court orders an employee reinstated under Title VII it "may" do so "with or without back pay," whichever is "appropriate." 42 U.S.C. sec. 2000e–5(g). That statute stresses the discretionary nature of the monetary relief "[t]o the point of redundancy." ` *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 719, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 (1978). By contrast, no such vesting of discretion is found in CERCLA. The statute simply specifies

---

**8.** It is unnecessary at this time to decide finally whether the Seventh Amendment requires a jury trial as to any of the United States' other claims, at least as matter of right. The broader implications of the right to trial by jury are discussed *infra* in section IV.

that certain classes of defendants will be liable for natural resource damages caused by releases from their property. Thus, the Court is unpersuaded that a money judgment for injury to natural resources should be considered equitable monetary relief. Instead, the monetary recovery is further evidence of the legal nature of a claim made under subsection (C).

The above reasoning, employed by this Court in rendering its decision from the bench, subsequently received strong support in analogous circumstances from the landmark decision of the Supreme Court in *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) holding that defendants have a right to a jury trial to determine liability for civil penalties sought by the government. In *Tull*, a case involving the civil penalty section of the Clean Water Act, 33 U.S.C. sec. 1319(d), the Supreme Court reasoned that civil penalties in general were historically viewed as a type of action in debt and, as such, were entitled to a jury trial. *Tull* has led at least one knowledgeable commentator[9] to conclude that, while actions seeking injunctive relief under sec. 106 [42 U.S.C. sec. 9606] or response costs under sec. 107(a)(4)(A) [42 U.S.C. sec. 9607(a)(4)(A)] are not triable as of right to a jury, the reasoning of *United States v. Tull* requires that actions to recover for natural resource damages under sec. 107(a)(4)(C) [42 U.S.C. sec. 9607(a)(4)(C)] and actions seeking civil penalties under sec. 109 [42 U.S.C. sec. 9609] must constitutionally receive a jury trial upon proper demand. E. Slavitt, "Jury Trial Rights under CERCLA: The Effects of *Tull v. United States*," 18 Env. L.Reptr. 10127, 10131 (April, 1988).

Accordingly, this Court denied the motion to strike Belleville's jury claim as to

the trial of natural resource damages under 42 U.S.C. sec. 9607(a)(4)(C) and continues after *Tull* to be of opinion that such a cause of action requires a jury trial, upon proper demand, as of right.

### III. *Jury Trial as of Right—State Claims in Federal Court*

■ All of what has just been said applies with equal force to the Commonwealth's claims for recovery of natural resource damages under the Massachusetts Clean Water Act, Mass.Gen.Laws ch. 21, sec. 27 (as amended) and the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass.Gen. Laws ch. 21E, secs. 1–13.[10] In addition, counts three and four of the Commonwealth's complaint seek an order requiring the defendants to abate the alleged public nuisance they have created, and to reimburse the Commonwealth for its expenditures in efforts to abate the nuisance. It is beyond question, and the defendants' implicitly concede, that an action by the state to enjoin the future maintenance of a public nuisance presents purely equitable issues. The claims for "reimbursement" of expenses incurred in abating the nuisance are separate matters, however. The Commonwealth takes the position that recovery of these costs constitutes restitution, which it argues is necessarily an equitable remedy. In support of this argument the Commonwealth cites *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), and *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). Upon examination, neither of those cases compels the conclusion that the claims for recovery of abatement costs present equitable issues.

---

**9.** A former Assistant United States Attorney, Mr. Slavitt earlier represented the United States in those aspects of these related cases to which it is a party. In the course of such representation, he participated in the submission of an able and thorough brief which, pre-*Tull*, argued vigorously against allowing the defendants a jury trial as matter of right with respect to any aspect of these proceedings.

**10.** There is no dispute that the right to a jury trial in federal court is governed by federal law,

regardless of whether the substantive claim arises under state or federal law. *Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963) (per curiam). It is instructive to note, moreover, that the right to a jury trial under the Constitution of the Commonwealth of Massachusetts is considerably broader than the cognate federal right under the Seventh Amendment. For an analysis of the right to jury trial under the Massachusetts Declaration of Rights, *see* Appendix.

*Porter* considered the power of a federal court to grant monetary relief in an enforcement proceeding under sec. 205(a) of the Emergency Price Control Act of 1942. There, the respondent landlord had demanded and received rents in excess of the lawful maximum. 328 U.S. at 396, 66 S.Ct. at 1088. The Administrator of the Office of Price Administration sought an injunction restraining future overcharges and requiring the landlord to return to the tenants the excess rents collected. *Id.* at 396–97, 66 S.Ct. at 1088. The district court and the Eighth Circuit both held that there was no jurisdiction to order restitution. *Id.* The Supreme Court reversed, holding that restitution was within the broad grant of equitable power contained within the statute. *Id.* at 397–400, 66 S.Ct. at 1088–90. The Supreme Court distinguished restitution under sec. 205(a) from the damages available under sec. 205(e) by noting that under the former section the Administrator:

> asks the court to act in the public interest by restoring the *status quo* and ordering the return of that which rightfully belongs to the purchaser or tenant. Such action is within the recognized power and within the highest tradition of a court of equity.

*Id.* at 402, 66 S.Ct. at 1091.

*Porter* does not support the Commonwealth's argument that recovery of abatement costs in a nuisance action is an equitable remedy. *Porter* was concerned solely with the scope of authority granted the district court by the statute at issue there. The Commonwealth appears to take the position that because an award of abatement costs would return it to its *status quo ante*, such an award properly is characterized as restitution and, further, such restitution is equitable in nature. The position is ill-founded. Were the Court to

accept the argument that a monetary reward is restitutionary simply because it returns a party to the pre-injury status, little would be left in the realm of compensatory damages. Nothing in *Porter* supports such a radical recharacterization of the law of remedies. In contrast, what was properly characterized as restitution in *Porter* was the classic case of a wrongdoer returning to a victim property that was illegally taken.[11] Moreover, even if the recovery here were restitutionary, that would not end the analysis. As is discussed further below, the label "restitution" is not a talisman before which all distinctions between legal and equitable issues must disintegrate.

In *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed. 2d 407 (1967), the United States sought to recover the costs it incurred in removing a negligently sunk vessel. The vessel owners refused payment, arguing that the exclusive remedy of the United States, found in Section 15 of the Rivers and Harbors Act of 1899, was to treat the vessel as abandoned and to sell it upon removal. *Id.* at 195, 197–99, 88 S.Ct. at 382, 383–84. The Supreme Court disagreed, ruling that the remedies under sec. 15 were not intended to be exclusive. The Court implied a cause of action for recovery of costs under sec. 16 of the Act because it viewed the criminal penalties of that section as insufficient to ensure the full effectiveness of the statute. *Id.* at 202–06, 88 S.Ct. at 386–88. The Supreme Court's analysis followed those cases in which it had implied a right of action available to private parties based on the violation of a criminal statute. *See, e.g., J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).[12] In holding the criminal penalties of sec. 16 insufficient, the court noted that "[t]hat

---

11. Indeed, a more analogous set of circumstances is found in the landlord-tenant context where a tenant sues her landlord whose negligence permitted her building to burn to the ground, resulting in the destruction of the tenant's possessions. Clearly the tenant's remedy would be a legal, not an equitable, one for damages equal to the value of the possessions destroyed. Such would be the case even though, as here, the

remedy amounts to a restitution of the value of wrongfully damaged property.

12. The Court observed that the Supreme Court "in a series of cases since *Borak* [has] adhered to a stricter standard for the implication of private causes of action...." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979).

section contains only meager monetary penalties ... [which in many cases] would not serve to reimburse the United States for removal expenses." *Wyandotte,* 389 U.S. at 202, 88 S.Ct. at 386. Because the statute provided that the owner was under a duty "to commence the immediate removal" of the sunken craft, *id.* at 197, 88 S.Ct. at 383, the Supreme Court inferred a congressional intent to provide the United States a cause of action to recover its costs if the owner refused to remove the vessel. *Id.* at 204, 88 S.Ct. at 387. The Supreme Court cited the Restatement of Restitution Section 115 [13] for the proposition that "the United States [did] not lose the right to place responsibility for removal upon those who negligently sank the vessel" simply because it chose to advance the public welfare by removing the vessel. *Id.* at 204, 88 S.Ct. at 387.

The Commonwealth understands *Wyandotte* to hold that "when the government incurs costs in eliminating a public hazard for which defendants are responsible, the suit to recover those costs seeks the equitable remedy of restitution." Plaintiffs' Memorandum in Support of Motion to Strike Jury Claim at 8. This simply is not the holding of *Wyandotte. Wyandotte,* like *Porter,* was a case about the remedies available under the particular statute in question.[14] The Supreme Court never hinted whether the cause of action it implied under sec. 16 presented legal or equitable issues. The Commonwealth assumes that, because the Supreme Court mentioned the Restatement of Restitution, the remedy it

fashioned was an equitable one. This assumption ignores the fact that the jurisdictions of law courts and equity courts have always overlapped with respect to restitution. As the introduction to the Restatement makes clear, much of the relief we now think of as restitutionary was available in the English common law courts in an action of assumpsit. Restatement of Restitution, Introductory Note at 5–7, 9–10 (1937). Indeed, section four of the Restatement specifies that:

> In situations in which a person is entitled to restitution, he is entitled, in an appropriate case, to one or more of the following remedies:
>
> .    .    .    .    .
>
> (f) a judgment at law or a decree in equity for the payment of money....

Thus, the Commonwealth's formalistic attempt to end the inquiry into whether the common law claims present legal issues by invoking the label "restitution" is clearly without merit.

Moreover, the Commonwealth cites no cases, and the Court's own research has not uncovered any, which suggest that as matter of state substantive law, the equitable remedy provided a governmental entity which seeks to enjoin a public nuisance includes reimbursement of costs incurred in abating the nuisance. The Court can find no Massachusetts case in which an equity court awarded monetary relief other than costs of suit to such an entity which had sued to enjoin a public nuisance.[15] *Cf.*

---

**13.** Section 115 of the Restatement provides that "[a] person who has performed the duty of another by supplying things or services ... is entitled to restitution if ... (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health or safety."

**14.** The Court specifically declined to "decide whether non-statutory public nuisance law may form a basis for the relief here sought by the Government." *Wyandotte,* 389 U.S. at 196 n. 5, 88 S.Ct. at 383 n. 5.

**15.** *Nassr v. Commonwealth,* 394 Mass. 767, 477 N.E.2d 987 (1985) does not support the Commonwealth's position. *Nassr* involved a bench trial which litigated the Commonwealth's unjust enrichment restitution claim that it be repaid

for cleaning up the defendant's land. The Commonwealth's claim was denied because it failed to show it had acted with intent to charge for its services. *Id.* at 776–77, 477 N.E.2d 987 (citing Restatement of Restitution sec. 115 [1937] ). Although the case was heard without a jury, the decision does not indicate whether the parties simply waived a jury trial or whether the trial court had determined that there was no right to a jury trial on the Commonwealth's restitution claim. On appeal to the Supreme Judicial Court, no issue was raised pertinent to jury rights. Indeed, to the extent *Nassr* provides any guidance, it is instructive to note that the court termed the Commonwealth's claim a common law—not an equitable—one. *Id.* at 774. Thus, it would appear that the Supreme Judicial Court would view the defendants to be entitled to a jury trial as of right on this issue.

*Commonwealth v. United Food Corp.*, 374 Mass. 765, 780–81, 374 N.E.2d 1331 (1978) (holding that the costs to the Commonwealth of bringing an abatement action may be properly awarded without a jury trial, but that any additional amount awarded punitively is improper without a jury trial). To the contrary, under Massachusetts law only plaintiffs who can prove "some special and peculiar" injury from the public nuisance are entitled to recover damages. *Stop & Shop Companies v. Fisher*, 387 Mass. 889, 894, 444 N.E.2d 368 (1983) (quoting *Willard v. Cambridge*, 85 Mass. (3 Allen) 574 [1862]). Indeed, it is precisely the recovery that the Commonwealth seeks here—the cost of repairing the affected property—that is probative of the measure of damages—*viz.*, the diminution in market value—in those cases where damages are available, *Medford Housing Auth. v. Marinucci Bros. & Co.*, 354 Mass. 699, 703, 241 N.E.2d 834 (1968). In such cases, the cost of repair is, in reality, often the measure of the damages themselves. This distinction between the power of the state to enjoin the public nuisance and the ability of the individually harmed plaintiff to collect damages is particularly relevant here because of the dual role played by the Commonwealth in this litigation. The Commonwealth sues not only as a sovereign seeking to abate a nuisance which interferes with the public rights of its citizens, but also as a trustee over the directly affected natural resources. In the latter role the Commonwealth is not unlike a private litigant suing for special damages. Given this dichotomy, and the apparent limits of the state substantive law, it is not clear to this Court that the claim for recovery of abatement expenses presents purely equitable issues.

Accordingly, because the recovery of abatement costs cannot be characterized as simple equitable restitution, because the legal or equitable nature of the remedies provided by state substantive law are unclear, and because the trend of *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and its progeny—as well as the strong public policy of Massachusetts as expressed in its Constitution[16]—is to favor jury trials in close cases,[17] this Court rules that the Commonwealth's claims for natural resource damages and recovery of public nuisance abatement expenses present legal issues which must be tried to a jury as matter of right.

IV. *Trial by Jury—The Larger Issues*

██ By attempting to characterize the issues in these cases as either equitable or legal, counsel on both sides no doubt focus the Court's attention on the proper inquiry. It is the nature of our constitutional heritage that the right to a jury trial cannot be determined without reference to the aging distinction between law and equity. Indeed, the resolution of this issue affects—as does no other pretrial matter—the entire approach of the litigants to the trial and every case management decision. But the technical language of lawyers must never be allowed to blur the great principles at stake each time the choice must be made between judge and jury.

From its very infancy this nation has viewed the civil jury as essential to the model of democracy described and created by our Constitution. Although our jury system borrows much from English history, the modern American jury is a distinctive creature in its own right. No other legal institution sheds greater insight into the character of American justice.[18] Writ-

16. In the words of the Massachusetts Framers, the right to a jury trial "shall be held sacred." Constitution of Massachusetts, Declaration of Rights, Article XV.

17. *Cf.* 9 C. Wright & A. Miller, *Federal Practice and Procedure*, sec. 2302 at 21 (1971) (contending that "[a]t a minimum the Beacon Theatres and Dairy Queen,] [Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962)] cases lend impetus toward finding a right to trial by jury in

doubtful cases") (underlining supplied) (footnote omitted).

18. " '[The American jury] must rank as a daring effort in human arrangement to work out a solution to the tensions between law and equity and anarchy.' " H. Ziesel, *The American Jury*, in *Final Report: The American Jury System* 72 (Roscoe Pound—American Trial Lawyers Foundation 1977) (quoting the last paragraph in H. Kalvens & H. Zeisel, *The American Jury* [1966] ).

ing almost 150 years ago, Alexis de Tocqueville noted that the American jury system should be considered from two perspectives; "as a judicial, and as a political institution." 1 A. de Tocqueville, *Democracy in America* 291 (H. Reeve text 1945). Tocqueville's profound observation remains equally true today. From both the judicial and political points of view, the civil jury makes an unmistakable contribution to the scheme of liberty and the rule of law that is the American promise of justice.

As an instrument of justice, the civil jury is quite simply the best we have. "[T]he greatest value of the jury is its ability to decide cases correctly." Joiner, *From the Bench*, in *The Jury System in America* 146 (R. Simon ed. 1975). We place upon juries no less a task than discovering and declaring the truth in each case. In virtually every instance these twelve men and women, good and true, rise to the task, finding the facts and applying the law as they in their collective vision see fit. In a very real sense, therefore, a jury verdict actually embodies our concept of "justice."

All of our rules of law purport to be based on the collective values of the community. Indeed, many of them explicitly refer to the behavior of the "reasonable person" as the determinative factor. Yet how would courts know these values or assess the conduct of reasonable people without the aid of the jury? The jury is the essential crucible inextricably melding the judicial system and the community it serves. Jurors bring their good sense and practical knowledge into our courts. Reciprocally, judicial standards and a respect for justice flow out to the community. *See* Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tx.L.Rev. 47, 59 (1977). The acceptability and moral authority of the justice provided in these courts rests in large part on the presence of the jury. The jury "tends to make the law intelligible by keeping it in touch with the common facts of life." Haines, *The Disappearance of Civil Juries in England, Canada, and Australia*, 4 Def.L.J. 118, 125 (1958). It is through this process, where rules formulated in light of common experience are applied by the jury itself to the facts of each case, that we deliver the very best justice we as a society know how to provide.

The jury system proves the wisdom of the Founders in their utilization of direct democracy to temper the potential excesses of the only unelected branch of government. "[T]he jury achieves symbolically what cannot be achieved practically—the presence of the entire populace at every trial." P. DiPerna, *Juries on Trial* 21 (1984). Through the jury we place the decisions of justice where they rightly belong in a democratic society: in the hands of the governed. One could scarcely imagine that the Founders would have created a system of courts with appointed judges were it not for the assurance that the jury system would remain.[19] In a government "of the people" the justice of the many cannot be left to the judgment of the few. Nothing is more inimical to the essence of democracy than the notion that government can be left to elected politicians and appointed judges. As Tocqueville so elegantly put it, "[t]he jury system ... [is] as direct and as extreme a consequence of the sovereignty of the people as universal suffrage." Tocqueville, *supra* at 294. Like all government institutions, our courts draw their authority from the will of the people to be governed. The law that emerges from these courts provides the threads from which all our freedoms are woven. It is through the rule of law that liberty flourishes. Yet, "there can be no universal respect for law unless all Americans feel that it is *their* law." Kaufman, *A Fair Jury—The Essence of Justice*, 51 Judicature 88, 91 (1967) (emphasis in original). Through the jury, the citizenry takes part in the execution of the nation's laws, and in that way each can rightly claim that the law belongs partly to her.

Only because juries may decide most cases is it tolerable that judges decide

---

19. "[T]he historical setting in which the Seventh Amendment was adopted highlighted a controversy that was generated ... by fear that the civil jury itself would be abolished. ..." *Colgrove v. Battin*, 413 U.S. 149, 152, 93 S.Ct. 2448, 2450, 37 L.Ed.2d 522 (1973).

some. However highly we view the integrity and quality of our judges, it is the judges' colleague in the administration of justice—the jury—which is the true source of the courts' glory and influence. The involvement of ordinary citizens in a majority of a court's tasks provides legitimacy to all that is decreed. When judges decide cases alone they "are still surrounded by the recollection of the jury." Tocqueville, *supra* at 297. Their voices, although not directly those of the community itself, echo the values and the judgments learned from observing juries at work. In reality, ours is not a system where the judges cede some of their sovereignty to juries, but rather where the judges borrow their fact-finding authority from the jury of the people.

In short:

It is the jury to which this nation has turned to fill the role of impartial fact finder. Its primacy ... guaranteed by the United States Constitution and those of the several states including Massachusetts, the American jury system is our most vital day-to-day expression of direct democracy. There is no other routine aspect of our civic existence today where citizens are themselves the government. Moreover, beyond involving citizens directly in one of the most fundamental processes of government, the jury system "injects community values into judicial decisions." [20] .... In this way the jury system "allows equitable resolution of hard cases without setting a legal precedent." [21] Moreover, jurors' "very inexperience is an asset because it secures a fresh perception of each trial, avoiding the stereotypes said to infect the judicial eye." [22] .... Without juries, the pursuit of justice becomes increasingly archaic, with elite professionals talking to others, equally elite, in jargon the elegance of which is in direct proportion to its unreality. Juries are the great leveling and democratizing element in the law. They give it its authority and generalized acceptance in ways that imposing buildings and sonorous openings cannot hope to match. Every step away from juries is a step which ultimately weakens the judiciary as the third branch of government. [23]

W. Young, J. Pollets, & C. Poreda, Supplement to Hughes, *Massachusetts Evidence* 4–5 (1989) (footnotes in the original text; certain other footnotes omitted).

It is against this background that a demand for a jury trial must be evaluated. It is true that the language of lawyers only invokes images of the dusty distinctions between the law courts and the chancellor sitting in equity, and that the terms "legal" and "equitable" do not even hint at the important purposes the jury system serves. But no matter how tied Seventh Amendment analysis remains to historical practice, one cannot ignore the importance of the civil jury to modern political life. That the foregoing sections have analyzed this matter in terms of the legal and equitable issues presented should not mislead. What imparts life to the resolution of this matter, indeed what makes it so important, is the contribution of the jury system to our daily freedoms and our political life.

For these reasons the Court, on its own initiative, acting pursuant to Fed.R.Civ.P. 39(c), orders that all factual issues in these related substantive cases not triable of right to a jury will, nevertheless, be submitted to the jury sitting in an advisory

**20.** Note, "The Right to a Jury Trial in Complex Civil Litigation," 92 Harv.L.Rev. 898, 898 (1979). *See generally* J. Frank, *Courts on Trial*, 126–137 (1950); Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex.L.Rev. 47, 56–60 (1977).

**21.** Note, *supra* note 20, at 898.

**22.** *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 355, 99 S.Ct. 645, 663, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting) (quoting H. Kalven & H. Zeisel, *The American Jury* 8 [1966]).

**23.** E. Hennessey, H. Clay & T. Marvell, *Complex and Protracted Cases in State Courts* (National Center for State Courts 1981). Indeed, it may be argued that the moral force of judicial decisions—and the inherent strength of the third branch of government itself—depends in no small measure on the shared perception that democratically selected juries have the final say over actual fact finding.

capacity. Such an approach has at least two important features to recommend it.

First, submission of all factual matters to the jury not only emphasizes the appropriate primacy of that expression of direct democracy in our dispute resolution process, it also makes for a much better trial.[24] For example, the presence of a lay jury requires the litigants to present their evidence in succinct, understandable fashion [25] with due regard for the appropriate focusing mechanisms provided by the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Use of an advisory jury throughout minimizes the tendency among attorneys to resort to the arcane and recondite. Indeed, the very presence of the jury tends—as matter of litigation tactics if nothing else—to encourage the simple, straightforward approach, thus inevitably improving the very quality of justice to be expected from these proceedings.

Second, judicial efficiency will be served in two respects by the use of a jury as to all factual aspects of the related substantive cases. Because certain aspects of these cases must be tried first to the jury under the Seventh Amendment, it only makes sense to utilize the jury to consider all aspects of common factual situations so that the litigants need present their full case only once. Moreover, as the reach of the jury trial right is still uncertain in these premises, utilization of the jury throughout will prevent any need for a re-trial should a finding deemed only advisory by this Court be later determined one that a jury must make as matter of right on the defendants' part.

**24.** These conclusions are admittedly not self-evident. While the experience of this Court tends to bear them out as do a number of thoughtful decisions and studies, *see, e.g., S R I Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1127–32 (Fed.Cir.1985) (additional views of two of eleven judges sitting *en banc* ); Tamm, *The Five–Man [sic] Civil Jury: A Proposed Constitutional Amendment, reprinted in Selected Readings: The Jury* 33 (American Judicature Society, G. Winters ed. 1971) ("[T]he accumulated every day experience of the jury renders it better equipped to determine the facts than the single judge with years of experience in the sophisticated environment of the court room."); Wyzanski, *A Trial Judge's Freedom and Responsibility,* 65 Harv.L.Rev. 1281, 1287 (1952) ("[J]udges' court experience counts for no more than juries' out-of-court experience.... Shrewdness founded on skepticism and sophistication has its place in scrutinizing the stories of witnesses. But there is a danger that the professional trier of fact will expect people of varied callings and cultures to reach levels of observation and narration which would not be expected by men of the witness' own background") (footnote omitted); M. Saks, *Small–Group Decision Making and Complex Information Tasks,* 26, 30 (Federal Judicial Center 1981) (and studies cited) ("Most studies show groups ... to make more accurate decisions and judgments.... [The] finding—that groups remember better than individuals and do so by generating more accurate [if not more voluminous] information—occurs reliably." [citations omitted] ), equally thoughtful decisions and reflections reach a contrary conclusion. *In re Japanese Elec. Prods. Antitrust Litigation,* 631 F.2d 1069 (3d Cir.1980); H. Zeisel, *The American Jury,* in *Final Report: The American Jury System* 67 (Roscoe Pound—American Trial Lawyers Foundation 1977) (quoting Dean Erwin Griswold); W. Burger, Robert Ainsworth Lecture, "Thinking the Unthinkable," (Loyola University, November 10, 1984); W. Burger, Address to the Conference of State Chief Justices (August 7, 1979).

For additional discussion of the value of juries, *see* M. Bloomstein, *Verdict: The Jury System* 126–138 (1968); Wolfson, *Improving Civil Jury: Possible Solutions,* Ill.B.J. 144 (Nov. 1984); Simon, *Keynote Address,* Ill.B.J. 140 (Nov.1984); Kaufman, *The Verdict on Juries,* N.Y. Times Mag. 42 (April 1, 1984); Burger, *Is Our Jury System Working?* Readers Dig. 2 (Feb. 1981); Carrigan, *The American Jury—Vanishing or Only Shrinking?,* 9 The Brief 21 (A.B.A.1980); *With Love in Their Hearts but Reform on Their Minds: How Trial Judges View the Civil Jury,* 4 Colum.J.L.Soc.Probs. 178–191 (1968); Lousberg, *On Keeping the Civil Jury Trial,* 43 Notre Dame Law. 344 (1968); Kreindler, *The Jury System in Tort Cases: Some Misconceptions Considered,* 51 A.B.A.J. 736 (August 1965).

**25.** "Many lawyers are sensitive to the risks of overwhelming jurors with facts and thereby losing their attention. Several lawyers emphasized the great care with which they manage the flow of testimony to the jury, stating specifically that they would not present as much information to the jury as they would present to the judge." G. Bermant, J. Cecil, A. Chaset, E. Lind, & P. Lombard, *Protracted Civil Trials: Views from the Bench and the Bar* 44 (Federal Judicial Center 1981). *See* Clark, *The American Jury: A Justification, reprinted in Selected Readings: The Jury* 5 (American Judicature Society, G. Winters ed. 1971) ("[S]tudies on the problem indicate clearly that a case tried before the judge does not proceed with as much dispatch as one before a jury.").

### V. *Conclusion*

For the reasons expressed herein, the sovereigns' motion to strike the defendants' jury demand is denied in its entirety. The Court rules that the United States' claim for natural resource damages under Section 107(a)(4)(C) and the Massachusetts' claims for cognate damages under the Massachusetts Clean Water Act, Mass.Gen. Laws ch. 21, sec. 27 (as amended), and the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass.Gen.Laws ch. 21E, secs. 1–13, as well as the Massachusetts claim for reimbursement for its expenditures in abating an alleged nuisance are all triable to a jury as of right under the Seventh Amendment. The remaining factual issues shall be tried to an advisory jury pursuant to Fed.R. Civ.P. 39(c).

### APPENDIX

In *Charles River Constr. Co. v. Kirksey*, Middlesex Superior Court No. 82–4847 (Mass.Super.Ct. Sept. 16, 1983), *aff'd on other grounds*, 20 Mass.App.Ct. 333, 480 N.E.2d 315 (1985), I had occasion as an Associate Justice of the Massachusetts Superior Court to consider the right to jury trial in Massachusetts:

> The right to a trial by jury in civil cases [in Massachusetts] has its basis in Article XV of the [Massachusetts] Declaration of Rights which provides:
>
>> In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherways used and practiced the parties shall have a right to trial by jury; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners' wages, the legislature shall hereafter find it necessary to alter it.
>
> Other than the Constitution of the United States, no source of law carries greater weight [in the Commonwealth].
>
>> "The purpose of the Declaration of Rights was to announce great and fundament[a]l principles, to govern the action of those who make and those who administer the law." ... "[T]he manifest object of the Declaration of Rights was, to give the most explicit and abiding sanction to some of the general principles, supposed to be essential ... for the general guidance and regulation, as well of the legislature as of the people."
>
> *Cepulonis v. Secretary of the Commonwealth*, 389 Mass. 930, 933, 452 N.E.2d 1137 (1983), [citations omitted] quoting from *Foster v. Morse*, 132 Mass. 354[,] 355 (1882) and *Commonwealth v. Kneeland*, 37 Mass. (20 Pick. 206, 219) (1838).
>
> The most thorough examination of the history and operation of Article XV is found in *Parker v. Simpson*, 180 Mass. 334, 344–[355] 62 N.E. 401 [1902] where the [Supreme Judicial] court concluded that Article XV "is a declaration of the common law right to a trial by jury, and in no way [is] inconsistent with the establishment of a court of chancery having general jurisdiction, *as it was at the time of the adoption of the Constitution[,] and proceeding in accordance with its fundamental rules of practice as then existing.*" *Id.* at 355, 62 N.E. 401. (emphasis supplied). "Where the right to trial by jury has the protection of the Constitution because connected with an action at common law, a party cannot be deprived of that right because a change in the form of procedure has made it cognizable in courts of equity." *Stockbridge v. Mixer*, 215 Mass. 41[5], 418, 102 N.E. 646 (1913) (Rugg, C.J.) citing *Powers v. Raymond*, 137 Mass. 483, 486 (1884) ("The rights sought to be determined and enforced are essentially legal as distinguished from equitable rights. The statute has changed the mode of procedure, but it would be trifling with the Constitution to hold that, by changing the forms of procedure, the substantial rights declared by it can be taken away. In all controversies which are within the perview of [Article XV] of the Declaration of Rights, the 'method of procedure['] of a trial by jury must be held sacred, whatever the other forms of procedure may be").

....

Surely a chose in action which may be transferred for good and valuable consideration is a form of property just as a case which results in an equitable decree that directs the payment of a substantial sum and the conveyance of certain real estate "is certainly a controversy concerning property." *Parker v. Simpson,* [180 Mass.] at 345–346. Indeed, any action in which one of the remedies sought is legal in nature, i.e. a money judgment that one person pay some fixed sum to another enforceable by supplementary process, would seem by the plain meaning of the words of the [Massachusetts] Constitution, "a controversy "between two or more persons".

....

Even in doubtful cases, this court believed that all intendments ought be made in favor of a jury trial. Surely this is the import of the constitutional command that "this method of procedure shall be held sacred". Article XV, Massachusetts Declaration of Rights. Moreover,

the jury system provides the most important means by which laymen can participate in and understand the legal system. "It makes them feel that they owe duties to society, *and that they have a share in its government* .... The jury system has for some hundreds of years been constantly bringing the rules of law to the touchstone of contemporary common sense. I.W. Holdsworth, A History of English Law 348–349 (3rd ed. 1922).

*Commonwealth v. Canon,* 373 Mass. 494, 516, 368 N.E.2d 1181 (1977) (Abrams, J. dissenting) (emphasis supplied in the dissent[ ),] [*cert. denied sub nom. Canon v. Commonwealth,* 435 U.S. 933, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978) ]. See *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 355, 99 S.Ct. 645, 664, 58 L.Ed.2d 552 (1979) (Rehnquist, J. dissenting) ("Jurors bring to a case their common sense and community values; their very inexperience is an asset be-cause it secures a fresh perception of each trial, avoiding the stereo-types said to infect the judicial eye." H. Kalven & H. [Z]eisel, The American Jury, 1966). Or, stated in another way:

The American civil jury serves various ends: it allows equitable resolution of hard cases without setting a legal precedent, it injects community values into judicial decisions, and it involves citizens in government.

Note, "The Right to a Jury Trial in Complex Civil Litigation," [92 Harv.L.Rev. 898, 898 (1979) (footnote omitted) ]. See generally J. Frank, Courts on Trial, 126–37 (1950); Broeder, The Functions of the Jury: Facts or Fictions? 21 U.Chi.L. Rev. 386–396 (1954); Higginbotham, Continuing the Dialogue: Civil Juries in the Allocation of Judicial Power, 56 Tex.L. Rev. 47, 56–60 (1977).

....

[Moreover, Article XII] has been expressly interpreted to require a jury trial in all cases where punitive sanctions may be imposed upon an individual. *Commonwealth v. United Food Corp.,* 374 Mass. 765, 779, 374 N.E.2d 1331 (1977) ("In order to fall within the catagory [sic] of legal actions which do not require a jury, the judgment in this case must be free from any solely punitive element"). *Commonwealth v. One 1972 Chevrolet Van,* 385 Mass. 198, 202, 431 N.E.2d 209 (1982) (While a forfeiture is both punitive and remedial, it is a deprivation of property under Art. XII and, therefore, a jury trial must be afforded).

To this court, Article XV appeared to have a dynamic sweep and a static exception. That is, the "sacred" method of dispute resolution for all manner of cases and controversies, both those then known and those which arise due to the changed conditions of society, was trial by jury *unless* the case was one in which a court of equity in England or the United States would have exercised jurisdiction in 1780. While it is true that Chief Justice Rugg, in *Stockbridge v. Mixer,* said in *dicta* that trial by jury does not exist as to rights gratuitously created by

the legislature." *Stockbridge v. Mixer,* *supra* 215 Mass. at 418, 102 N.E. 646, the case cited for that proposition in actuality has a much more narrow focus. In *Sawyer v. Commonwealth,* 182 Mass. 245, 65 N.E. 52 (1902), the Supreme Judicial Court speaking through Chief Justice Holmes held that no jury trial right existed with respect to proceedings before a certain water board to determine the diminution in value of the plaintiff's business as a consequence of major public works legislation. The ground of the court's decision in *Sawyer* is only that such diminution in value, absent an actual taking, is not a property right and thus Article XV does not apply since [the] controversy is not one concerning property. Significantly, Chief Justice Holmes says, "If indeed the loss which they have suffered were within [the] protection of the Constitution, there would be the strongest reason for construing the statute as giving them whatever right the Constitution secures". *Id.* at 183 [sic]. Ironically, it was the same Arthur P. Rugg who later became Chief Justice of the Supreme Judicial Court who contended that Sawyer ought have a jury trial in that case. There is, therefore, no general principle that when the legislature creates new rights as between private parties, the right to a jury as well does not attach. Indeed, this court believed that the right automatically attached unless the new cause of action fell within the exception.

*Charles River Constr.,* slip op. at 15 n. 7 (restructured in this opinion).

Under the Seventh Amendment to the United States Constitution, however, it is the right to a jury trial itself which is static. Thus the federal guarantee is much narrower than that which the Massachusetts Constitution affords its citizens. In the courts of the United States, the inquiry focuses upon whether the cause of action was triable to a jury as of right in 1787. In Massachusetts, in contrast, the jury trial right attaches to all new causes of action whatever their nature unless the relief permitted is other than penal and could have been granted by a Massachusetts court of equity in 1780.[1]

---

1. Admittedly, the Massachusetts Supreme Judicial Court held in *Nei v. Burley,* 388 Mass. 307, 315, 446 N.E.2d 674 (1987) (Nolan, J.) that there is no jury trial of right under the Massachusetts Constitution for causes of action arising under the statutorily created remedies of Mass.Gen. Laws ch. 93A notwithstanding the significant overlap of that type of action with an action of fraud at common law. The effect of the potential punitive damages sanction was, however, never presented by the parties in *Nei* nor was it considered by the Supreme Judicial Court. The holding of *Nei* ought, therefore, be confined to the specific cause of action there considered. Indeed, *Nei* now has little practical precedential effect even as to actions under Mass.Gen.Laws ch. 93A since it is now clear that the presiding judge may commit the resolution of a chapter 93A claim to a jury as a matter of discretion, although not of constitutional right, *Travis v. McDonald,* 397 Mass. 230, 233–34, 490 N.E.2d 1169 (1986); *Service Publications, Inc. v. Goverman,* 396 Mass. 567, 577–578, 487 N.E.2d 520 (1986) (Nolan, J.), and today the great majority of justices of the Massachusetts Superior Court routinely commit such claims to the jury.