**In re ACUSHNET RIVER & NEW BEDFORD HARBOR PROCEEDINGS re ALLEGED PCB POLLUTION.**

Civ. A. No. 83–3882–Y.

United States District Court,
D. Massachusetts.

June 7, 1989.

Ellen M. Mahan, William D. Brighton, Environmental Enforcement Section Land and Natural Resources Div., Washington, D.C., Martha Sosman, Chief, Civ. Div., Boston, Mass., for the U.S.

Lee Breckenridge, Chief, Nancy Preis, Asst. Attys. Gen., Environmental Protection Div. Dept. of the Atty. Gen., Boston, Mass., for the Com. of Mass.

Charles C. Bering, Office of Regional Counsel, U.S. EPA–Region I, Boston, Mass., Alice Crowe, OECM–Waste, LE 134S U.S. EPA Headquarters, Washington, D.C., for the U.S. E.P.A.

Hugh Schratwieser, Office of Gen. Counsel, Washington, D.C., for the Nat. Oceanic and Atmospheric Admin.

Daniel J. Gleason, Mary K. Ryan, Brian T. Kenner, Nutter, McClennan & Fish, Boston, Mass., for AVX Corp.

Paul B. Galvani, Roscoe Trimmier, Jr., Ropes & Gray, Boston, Mass., for Aerovox, Inc.

David A. McLaughlin, Michael J. McGlone, McLaughlin & Folan, New Bedford, Mass., for Belleville Industries, Inc.

Verne Vance, Jr., Richard W. Benka, Foley, Hoag & Eliot, Boston, Mass., for Cornell Dubilier Electronics Co., Inc.

John R. Quarles, Howard T. Weir, Morgan, Lewis & Bockius, Washington, D.C., for Federal Pacific Elec. Co.

Robert J. Muldoon, Jr., Daniel B. Winslow, Barbara O'Donnell, Sherin & Lodgen, Boston, Mass., for Aerovox, Inc. (Ins. Litigation).

William M. Savino, Gary D. Centola, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., Cynthia J. Cohen, Michael B. Bogdanow, Meehan, Boyle & Cohen, Boston, Mass., for Firemen's Fund Ins. Co.

James L. Ackerman, Day, Berry, Howard, Boston, Mass., Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for Aetna Cas. and Sur. Co.

John P. Ryan, Sloan & Walsh, Boston, Mass., for Hartford Ins. Co.

Michael S. Greco, Lisa D. Campolo, Hill & Barlow, Boston, Mass., Timothy C. Russell, T. Andrew Culbert, Drinker, Biddle & Reath, Washington, D.C., for Lumbermen's Mut. Cas. Co. and American Motorists Ins.

Stephen J. Paris, Michael F. Aylward, Morrison, Mahoney & Miller, Boston, Mass., for CNA Ins. Co. and Reliance Ins. Co.

Roger E. Warin, Stephen A. Fennell, Anita G. Raby, Steptoe & Johnson, Washington, D.C., for Highlands Ins. Co.

Wm. Gerald McElroy, Jr., John T. Harding, Jr., Zelle & Larson, Waltham, Mass., for Employers Ins. of Wausau.

James P. Whitters, III, Gaston & Snow, Boston, Mass., for Liberty Mut. Ins. Co.

Bert J. Capone, Deborah S. Griffin, Peabody & Arnold, Boston, Mass., for Home Ins. Co. and Lexington Ins. Group.

Robert F. Corliss, Robert A. Romero, Jr., Corlis & Romero, Boston, Mass., Mary Ann D'Amato, Paul Moran, Mendes & Mount, New York City, for Underwriters at Lloyd's.

Pamela C. Slater, Allan E. Taylor, Taylor, Anderson & Travers, Boston, Mass., for First State Ins. Co.

Timothy P. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for Mission Ins. Co.

Calum B. Anderson, Parker, Coulter, Daley & White, Boston, Mass., for Northbrook Excess & Surplus Ins. Co.

Carl K. King, Gayle M. Merling, Goldstein & Manello, Boston, Mass., for EPEC, Inc.

Erik D. Olson, Counsel, Nat. Wildlife Federation, Washington, D.C., for Nat. Wildlife Federation.

## MEMORANDUM CONCERNING NATURAL RESOURCE DAMAGES UNDER CERCLA[1]

YOUNG, District Judge.

Subsection 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") provides, in part, that owners and operators of facilities from which there are releases or threatened releases which cause the incurrence of response costs, shall be liable for:

(4)(A) all costs of removal or remedial action incurred by the United States Government or a State ...; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release....

42 U.S.C. sec. 9607(a)(1), (4)(A), (C).

With respect to natural resource damages, as opposed to response costs, subsection 107(f)(1) of CERCLA, in pertinent part, limits the amount of recoverable damages as follows:

There shall be no recovery under the authority of subparagraph (C) of subsection (a) of this section where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

42 U.S.C. sec. 9607(f)(1).

### I.

The defendant Aerovox, Inc. ("Aerovox") has moved for partial summary judgment concerning the scope of the damages recoverable under subsection 107(f) of CERCLA.[2] More specifically, Aerovox contends that subsection 107(f) of CERCLA limits the scope of recovery for natural resource damages to the increment of damages that occurred on or after the enactment of CERCLA on December 11, 1980. The plaintiffs, the United States and the Commonwealth of Massachusetts (the "sovereigns"), oppose this motion and argue that they are entitled to recover for all pre- and

---

1. This memorandum continues the discussion of the pre-trial issues raised in these partially consolidated cases. It is intended to be read with the Court's earlier decisions concerning jurisdiction and parties, *Acushnet River and New Bedford Harbor Proceedings re Alleged PCB Pollution*, 675 F.Supp. 22 (D.Mass.1987) ("*Acushnet I*"), the right to jury trial, *Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 712 F.Supp. 994 (D.Mass.1989) ("*Acushnet II*"), successor liability, *Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 712 F.Supp. 1010 (1989) ("*Acushnet III*"), and partial settlements, *Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 712 F.Supp. 1019 (1989) ("*Acushnet IV*").

2. This Court notes that the Department of Interior has promulgated regulations regarding the valuation of natural resource damages. *See* Cross, *Natural Resource Damage Valuation*, 42 Vand.L.Rev. 269, 321 (1989); Anderson, *Natural Resource Damages, Superfund, and the Courts*, 16 B.C.Envt'l Aff.L.Rev. 405, 441 (1989). However, such regulations have not been relied upon by the Court as they are currently being challenged in the federal circuit for the District of Columbia. *See National Wildlife Fed'n, Envt'l Defense Fund v. United States Dept. of the Interior*, No. 87–1266 (D.C.Cir. filed June 18, 1987) (and consolidated cases).

post-enactment natural resource damages as long as they can show that such damages or the releases from which such damages resulted continued after enactment.

This Court must decide two issues: first, what is the appropriate scope of recovery for natural resource damages and, second, which party has the burden of proving whether natural resource damages occurred before or after enactment within the meaning of the subsection 107(f) limitation. While the Court has spoken to these matters from the bench, the issues raised warrant a written opinion.

## II.

The plain language of subsection 107(f) indicates, and the parties do not dispute, that pre-enactment natural resource damages caused by pre-enactment releases of hazardous substances are not recoverable where the releases and the damages do not continue to occur post-enactment. It is also not disputed that at least the incremental post-enactment natural resource damages caused by either pre- or post-enactment releases are recoverable. The dispute in this case arises with respect to the scope of recovery when pre-enactment releases cause injury which results in both pre- and post-enactment damages or when

releases continue post-enactment and thus do not occur "wholly" before December 11, 1980. It is the sovereigns' position, when releases or damages continue to occur post-enactment, that recovery for natural resource damages which occur both pre- and post-enactment is appropriate.[3]

The sovereigns argue that subsection 107(f) only applies to situations involving so-called "stable sites." In other words, if they can show that releases or damages continued to occur after December 11, 1980, the sovereigns claim that they are entitled to the totality of damages to the New Bedford Harbor (the "Harbor"). More specifically, the sovereigns argue that the statute prohibits the recovery of natural resource damages only in the limited circumstances where releases and damages have occurred wholly before the date of enactment, December 11, 1980. Because they allege that both releases and damages continue to occur, they claim that Aerovox is liable for all the natural resource damages to the Harbor and its surrounding waters regardless of when they occurred. Aerovox argues that the sovereigns can recover only for the increment in natural resource damages that occurs after the enactment date. Because of the uncertain nature of the statutory language, the legis-

---

**3.** While there is a presumption against the retroactive application of statutes, *United States v. Security Industrial Bank,* 459 U.S. 70, 79–80, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982), Congress manifestly intended CERCLA to apply retroactively in order to clean up wastes generated prior to enactment, the statutory scheme being overwhelmingly retrospective and remedial. *See, e.g., United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 732–33 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). Indeed, it must be so. As one court has put it:

> [CERCLA] is by its very nature backward looking. Many of the human acts that have caused the pollution already had taken place before its enactment; physical and chemical processes are at their pernicious work, carrying destructive forces into the future.

*United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1072 (D.Colo.1985). Courts, as well, have consistently applied subsection 107(a)(4)(A) retroactively, ruling that plaintiffs can recover for response costs to clean up pre-enactment damages and that the imposition of such liability does not offend due process. *Northeastern*

*Pharmaceutical,* 810 F.2d at 734–37; *United States v. Hooker Chem. & Plastics Corp.,* 680 F.Supp. 546, 556–57 (W.D.N.Y.1988); *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361, 1398–99 (D.N.H.1985); *Town of Boonton v. Drew Chem. Corp.,* 621 F.Supp. 663, 668–69 (D.N.J.1985); *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 218–19 (W.D.Mo. 1985); *United States v. Ward,* 618 F.Supp. 884, 898–99 (E.D.N.C.1985); *Shell Oil,* 605 F.Supp. at 1076–77; *Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1302–14 (N.D.Ohio 1983); *see generally Developments in the Law—Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1555–62 (1986).

These cases, of course, do not control the present case because, as subsection 107(f) makes explicit, CERCLA treats recovery for natural resource damages under subsection 107(a)(4)(C) differently from recovery of response costs under subsection 107(a)(4)(A). *Northeastern Pharmaceutical,* 810 F.2d at 736; *Town of Boonton,* 621 F.Supp. at 669; *Shell Oil,* 605 F.Supp. at 1076. Thus, this Court must interpret subsection 107(f) to determine to what extent it limits the sovereigns' ability to recover for natural resource damages in this case.

lative history,[4] and, not surprisingly, the case law [5] surrounding this provision, the

**4.** The legislative history pertaining to subsection 107(f) is extremely limited and inconclusive. Indeed, that history actually pertains to subsection 4(n)(1) of Senate Bill 1480, a precursor to subsection 107(f). The sovereigns cite the following passage:

> Section 4(n) specifies how claims to certain damages occuring before the date of enactment will be handled under sec. 1480. Costs of removal (cleanup and containment) are not affected by this provision, *nor are any damages associated with continuing releases.*

S.Rep. No. 848, 96th Cong., 2d Sess. 37, *reprinted in* A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), Public Law 96–510 at 344 (emphasis added).

Despite the sovereigns' contrary assertion, this Court rules that this language, standing alone, is ambiguous. Are the "damages associated with continuing releases" all pre- and post-enactment damages as the sovereigns assert, or merely all post-enactment damages associated with continuing (i.e., post-enactment) releases? Language a paragraph later further muddies these delta waters: "[Section 4(n)] allows for ... recovery only of prospective natural resource and property damages." S.Rep. No. 848, 96th Cong., 2d Sess. 37, *reprinted in* A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), Public Law 96–510 at 344. Aerovox argues, with some force, that such language means that no injury to natural resources occurring pre-enactment is compensable. However, this language may simply state the general rule to which the foregoing language provides an exception.

**5.** Case law pertaining to subsection 107(f)(1), although containing some language supportive of what may be termed the sovereigns' "stable sites" position, is likewise ambiguous and ultimately inconclusive. A stable site is one that will not deteriorate further. The stable site analysis stems from an apparent misinterpretation of an admittedly ambiguous passage in *Shell Oil,* 605 F.Supp. at 1076. That court, in holding that Congress intended retroactive application of subsections 107(a)(4)(A) and (B), premised its decision on the fact that Congress had only "affirmatively limit[ed] retroactive application of the third category of liability, damages to natural resources, section 107(a)(4)(C)." *Id.; see also Northeastern Pharmaceutical,* 810 F.2d at 736 (quoting *Shell Oil* ). The court explained this exclusion of stable sites from natural resource damages claims under subsection 107(e)(1) as well as from Superfund claims under subsection 111(d)(1) thus:

> The sites excluded under 107(f) and 111(d) are stable sites, that is, the environment, though damaged, will not deteriorate further.... Congress apparently decided to utilize the limited resources of [Superfund] ...

to clean up thousands of sites ... which are not stable.

*Shell Oil,* 605 F.Supp. at 1076; *Northeastern Pharmaceutical,* 810 F.2d at 736 (quoting *Shell Oil* ). This reasoning makes perfect sense as far as it goes, but it only goes so far as to explain why subsection 111(d)(1) limits retroactivity with respect to Superfund, not why subsection 107(f)(1) limits retroactivity with respect to natural resource damages; an unstable site clearly needs to be cleaned up to protect the environment from further damage but failure to recover money to restore natural resources does not affect a site's stability. Because of the limited applicability of this reasoning as well as the fact that such reasoning is purely dictum in both cases, this Court finds these cases unpersuasive on the issue before it. It should also be noted that the *Shell Oil* court's ruminations about the meaning of 107(f) contain the following passage which, while not free from ambiguity, seems to undercut the sovereigns' position: "[W]here Congress has intended a liability provision to have only *prospective* operation, as in the case of natural resource damages, Congress has so stated explicitly." 605 F.Supp. at 1079 (emphasis added).

More on point is *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665 (D.Idaho 1986) (*Bunker Hill I* ). The state in *Bunker Hill I,* in seeking to recover for natural resource damages which had occurred from the operation of the defendant's facility over the past century, had argued that "continuing damage" is outside the bar of subsection 107(f) because the "damage" had therefore not occurred wholly before CERCLA's date of enactment. *Id.* at 674.

> In other words, the State claims that if the natural resources in the area have been damaged, at any time during which the defendants have operated in the area over the past century, and that the natural resources remain in that damaged state unabated, then the Section 107(f) bar is not applicable since the damage has not occurred wholly before enactment of the statute.

*Id.* By the term "damage," the state and the *Bunker Hill I* court may have meant "injury" as opposed to "damages" as that term is defined in the statute. 42 U.S.C. sec. 9601(6). Indeed, in a related opinion explicating another portion of the *Bunker Hill I* case, *Aetna Casualty & Surety Co. v. Gulf Resources & Chem. Corp.,* 709 F.Supp. 958, 962 (D.Idaho 1989), the same court again seemed to indicate that "damage," in its lexicon, means injury, although the matter is not free from doubt: "This court has already held that the [relevant insurance policies] only provide coverage when the *property damage* for which *damages* are sought and the cause of that *damage* both occurred during the policy period." *Id.* (citing *Idaho v. Bunker Hill,* 647 F.Supp. 1064, 1070–71) (D.Idaho 1986) (*Bunker Hill II* ) (emphasis added). At any rate, in *Bunker Hill I,* the state and the court seem to have

Court must itself define and conceptualize the statutory terms with little guidance from any source.[6]

■ The first analytic step is defining the key terms in the disputed statute. It is argued to this Court that the term "damages" as used in subsection 107(f) refers to the injury to natural resources, not to the monetary quantification of that injury. The Court rejects that interpretation. First, the statute itself, although "not a paradigm of clarity or precision," *Artesian Water Co. v. New Castle County*, 851 F.2d 643, 648 (3d Cir.1988), *see also supra* note 6, does define the term "damages" as follows: "The term 'damages' means damages for injury or loss of natural resources...." Although circular, the above

passage, fairly read, appears to define damages as monetary quantification stemming from an injury. This Court adopts that definition.

It is asserted that the drafters of CERCLA were sloppy with respect to the terms "damages" and "injury" and frequently used one when they meant the other. Indeed, subsection 111(d)(1), the companion provision to subsection 107(f), lends some support to this view. That subparagraph provides as follows:

No money in the Fund may be used under subsection (c)(1) and (2) of this section, nor for the payment of any claim under subsection (b) of this section, where *the injury, destruction, or loss of*

used "damage," however they defined it, as an equivalent of the term "damages" (i.e. the monetary quantification of the injury) in subsection 107(f).

The *Bunker Hill I* court rejected the state's argument because, regardless of whether the "damage" remains unabated post-enactment, if it occurred pre-enactment, the state could not recover. Unfortunately, that court did not reach the crucial question in this case: "When do damages occur?" For a further discussion of *Bunker Hill I, see infra* note 9.

A third case considering the meaning of subsection 107(f) is *United States v. Reilly Tar & Chem. Corp.*, 546 F.Supp. 1100 (D.Minn.1982). There, the court held that the defendant could escape liability for natural resource damages "only where (1) all releases ended before December 11, 1980, and (2) no damages were suffered on or after December 11, 1980 as a result of the release." *Id.* at 1120. While the sovereigns make much of the first clause of the quoted language, arguing that it means that any post-enactment release makes all natural resource damages recoverable, this Court holds that in context the language is somewhat ambiguous. Indeed, this passage more likely means that, when one or neither of the enumerated conditions are present, a defendant is partially, not fully, liable for natural resource damages. In other words, the opinion more likely means that each occurrence of damages must be analyzed to determine whether it and its precipitating release both occurred prior to enactment. In that circumstance, but not otherwise, recovery is barred. The *Reilly Tar* court itself did not reach this issue. Rather, it denied the defendant's motion to dismiss because the complaint alleged continuing releases and damages from those releases, and determined that "[t]he extent to which [the defendant] will be entitled to escape liability under section 107(f) is a fact question to be resolved in future proceedings."

*Id.* As in *Bunker Hill I, Reilly Tar* does not define when damages occur.

A final case addressing the scope of 107(f), *United States v. Wade*, 20 E.R.C. 1657 (E.D.Pa. 1984), also rejected a defendant's motion to dismiss a count asserting natural resource damages because releases might still have been occurring in 1984. *Id.* at 1659. The decision is not helpful here because the court may well have meant only that it would not dismiss the count because post-enactment releases might have caused post-enactment damages, not that post-enactment releases made the defendant liable for both pre- and post-enactment damages.

6. Like many a court before it, this Court cannot forbear remarking on the difficulty of being left compassless on the trackless wastes of CERCLA. This Court has previously noted the statute's incomprehensible nature. *Acushnet River and New Bedford Harbor Proceedings re Alleged PCB Pollution*, 675 F.Supp. 22, 25 n. 2 (D.Mass.1987) (and cases cited). Other courts have concurred. *E.g., Artesian Water Co. v. New Castle County*, 851 F.2d 643, 648 (3d Cir.1988); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1080 (1st Cir.1986). It astounds this Court that a statute as important as CERCLA is to the protection of our environment and the public health remains as inscrutable as ever—as the following passages of this opinion that attempt to decipher it reveal—notwithstanding the major legislative overhaul of the statute via the SARA amendments in 1986. While some of the apparent inconsistencies may be the result of the horse-trading that is perhaps inevitable in the passage of such a controversial bill, much of it appears to be due merely to poor drafting. A further round of amendments designed simply to clean up the discrepancies revealed in the following passages would go far to saving litigants' money and courts' time as well as the statute itself from interpretations contrary to the intent of Congress.

*natural resources* and the release of a hazardous substance from which *such damages* resulted have occurred wholly before December 11, 1980.

42 U.S.C. sec. 9611(d)(1) (emphasis added). In that provision, "such damages" appears to refer to "the injury, destruction, or loss of natural resources...."

However, read in the context of the entire subparagraph of which it is a part, the term "damages," as employed in the last sentence of 107(f)(1), does not seem misused.[7] The phrase "such damages" as used twice in that sentence both times appears to refer, not to injury to natural resources, but to the term "damages" in subsection 107(a)(4)(C). There, "damages" is self-evidently distinct from "injury": "[Liability will be imposed for] *damages* for injury to, destruction of, or loss of natural resources...." 42 U.S.C. sec. 9607(a)(4)(C) (emphasis added).[8]

---

7. The relevant wording of subsection 107(f)(1) is as follows:

> In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) of this section liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State ...: *Provided, however,* That no liability to the United States or State ... shall be imposed under subparagraph (C) of subsection (a) of this section, where the party sought to be charged has demonstrated that the damages to natural resources complained of were specifically identified as an irreversible and irretrievable commitment of natural resources in an environmental impact statement, or other comparable environment analysis, and the decision to grant a permit or license authorizes such commitment of natural resources, and the facility or project was otherwise operating within the terms of its permit or license.... The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages. Sums recovered by the United States Government as trustee under this subsection shall be retained by the trustee, without further appropriation, for use only to restore, replace, or acquire the equivalent of such natural resources. Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action under subparagraph (C) of subsection (a) of this section shall not be limited by the sums which can be used to restore or replace such resources. There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource. There shall be no recovery under the authority of subparagraph (C) of subsection (a) of this section where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

42 U.S.C. sec. 9607(f)(1) (emphasis in original).

8. A final argument in favor of the Court's interpretation concerns subsection 112(d) which, prior to the SARA amendments, provided:

> No claim may be presented, nor may an action be commenced for damages under this subchapter, unless that claim is presented or action commenced *within three years from the date of the discovery of the loss or December 11, 1980, whichever is later....*

42 U.S.C.A. sec. 9612(d) (West 1983) (superceded) (emphasis added).

"Damages" in this now outdated version of subsection 112(d) refers to natural resource damages by definition. 42 U.S.C. sec. 9601(6). This being the case, the language in this provision, "within three years from ... December 11, 1980," would effectively be vitiated by a reading of the term "damages" in 9607(f) to mean "injury." This is so because such a reading means that any injury that occurred wholly before enactment would necessarily not be compensable. Thus, under no circumstances would a CERCLA plaintiff have a claim for natural resource damages that must be presented prior to December 11, 1980. Therefore, the statute, with respect to natural resource damages, would in effect be rewritten to state that the action must be commenced within three years from the date of the discovery of the loss, it being apparent from the rest of the statute that underlying the claim must be an injury that occurred after December 11, 1980. The Court is reluctant so to interpret one provision of CERCLA as to eviscerate a portion of another. For a further discussion of subsection 112(d) and the manner in which the Court's interpretation of subsection 107(f) interacts with subsection 112(d), *see infra* note 16.

The fact that this statute was rewritten as part of the SARA amendments in 1986 and that the amendments eliminate language pertaining to the dates of enactment does not indicate that Congress realized that the language referring to December 11, 1980 was surplusage. Rather, the new version of subsection 112(d) permits damages claims presented within three years of the later of "[t]he date of the discovery of the loss and its connection with the release in question [and] [t]he date on which the final regulations are promulgated under [42 U.S.C. sec. 9651(c)]." Thus, it merely broadens significantly the time in which the sovereigns have to present a claim for natural resource damages.

■ The second term to be defined is "occurred." Aerovox contends that damages occur, in effect, when injury occurs. Thus, although no monetary impact due to PCB contamination of the mud at the bottom of the Harbor may have been felt until after enactment by a property owner, for example, when that owner incurred additional expenses during the building of a wharf due to the expense of disposing of contaminated dredge spoils, the "damages" had "wholly occurred" prior to enactment because the mud had become contaminated —i.e., the injury to natural resources had occurred—prior to enactment. The Court rejects this view and holds that "damages" —i.e., monetary quantification of the injury done to the natural resources—"occur" as a general rule when the property owner in this example, or some entity as a general rule, incurs expenses due to the injury to natural resources—i.e., when the owner seeks to develop the waterfront property.[9]

9. In a related motion seeking partial summary judgment concerning the claims of Belleville Industries, Inc. ("Bellville") for indemnification for its liability under 42 U.S.C. sec. 9607(a)(4)(C), Belleville's insurer, Lumbermens [sic] Mutual Casualty Co. ("Lumbermens") urges this Court to define "damages" as a compensatory award of money for redress of an injury. As to when such damages occur, Lumbermens urges the Court to fashion a federal common law rule to ensure uniformity nationwide in CERCLA actions, rather than relying on state law. This Court agrees with both propositions, at least in the CERCLA context. See United States v. Wade, 577 F.Supp. 1326, 1338 (E.D.Pa. 1983) (holding that "[f]ederal courts may create federal common law when 'necessary to protect uniquely federal interests'" in the context of determining that joint and several liability should apply, in general, to a CERCLA action) (quoting Texas Indus. v. Radcliff Materials, 451 U.S. 630, 640, 101 S.Ct. 2061 [2067, 68 L.Ed.2d 500 1981]); cf. Teague v. Nat'l R.R. Passenger Corp., 708 F.Supp. 1344, 1348 n. 5 (D.Mass.1989) (noting the need for federal common law in the Federal Employers' Liability Act context). Lumbermens then argues that the Court should hold that damages occur when they accrue at common law—i.e., at the time of the injury itself.

The Court declines to so hold, at least in the CERCLA context. (What the term "occurrence" may mean in the context of the contractual understanding between an alleged polluter and its insurer may be something else altogether—a point on which this Court presently expresses no opinion.) From a drafting stand-point, it makes no sense to have drafted this statutory passage as it stands if "occur" is read to mean "accrue" in the sense that Lumbermens uses the term "accrue." Were that the intent of Congress, it could simply have approved language that provided, "There shall be no recovery ... where an injury to natural resources has occurred wholly before December 11, 1980," given that damages, Lumbermens urges, accrue contemporaneously with the injury. While the imprecise language of the statute does not absolutely forbid such a reading, the Court rejects Lumbermens' interpretation for the further reason that such an interpretation of the statute runs counter to the broad remedial purpose of the statute and Congress' intent to hold polluters responsible for their acts.

The case of Idaho v. Bunker Hill Co., 635 F.Supp. 665 (D.Idaho 1986) (Bunker Hill I) does not sway this Court. As Lumbermens forthrightly notes, the court's decision, although it can be read as supporting Lumbermens' position, is less than clear. Bunker Hill I held that "to the extent that both the release and the resultant damage occurred prior to enactment, Section 107(f) bars recovery." Id. at 675. If one reads "damage" in the above passage to signify injury and not damages, Bunker Hill I appears to support Lumbermens' position. This Court is unpersuaded by Bunker Hill I because of the uncertainty as to what that court actually held and because nowhere are the terms "damage," "damages," and "occurred" discussed in any detail or defined.

As a consequence of the Court's ruling today, Lumbermens' motion for partial summary judgment is denied. Lumbermens' policy with Belleville requires Lumbermens to pay on behalf of Belleville all sums which Belleville shall become legally obligated to pay as damages because of physical injury to, destruction of, or loss of use of tangible property which occurred during the policy period, 1973–76. See Lumbermens' Memorandum of Law in Support of Its Motion for Partial Summary Judgment Concerning Indemnification for Claims Brought Under 42 U.S.C. sec. 9607(a)(4)(C) (Docket # 1253) at 17. Lumbermens argues that, because in their view damages accrue and therefore occur comtemporaneously with the injury, any damages for which Lumbermens might have an obligation to pay under the policy would have occurred no later than 1976 and thus be unquestionably pre-enactment damages and thus not recoverable.

Because this Court rejects the premise that damages occur when they accrue at common law, Lumbermens' argument fails. Lumbermens does not dispute that there is at least a genuine issue of material fact whether releases from the Belleville facility caused such injury or destruction or loss of use during the policy period. This Court holds that a genuine issue exists whether such releases and the injury they caused have at least partially caused the damages that occurred post-enactment. The Court

The second step is conceptualization of the grounds of dispute. The different theories of recovery discussed herein, albeit somewhat simplified,[10] may be illustrated by the following graph:

The portions of the graph designated in the aggregate as Areas I, II, and III represent the sovereigns' theory of recovery. The portion designated Area II represents Aerovox's theory. As will be demonstrated below, Areas II and III represent the theory of recovery that comports most exactly with the dictates of the statute.[11]

presently expresses no opinion concerning whether such releases are "sudden and accidental" within the meaning of the insurance contract between Lumbermens and Belleville. That remains to be determined.

10. Conceptually, the graph depicts any PCB presence in the environment as "polluted," not "pristine," and depicts "damage" as injury to the environment commencing at the moment of release, *i.e.*, the moment at which a molecule of allegedly toxic PCB moved beyond the confines of the facility and into the larger environment in a spatial or geographical sense. This is not, however, to say that the sovereigns could recover any "damages" for the migration or "release" of a single PCB molecule even if it occurred post-enactment, nor does it mean that release necessarily equals injury. *See* this Court's definition of "damages" *supra* at 681. Likewise, to best depict the various contentions, the graph assumes that each PCB release injures the environment to an ever increasing degree. In actual practice, this matter will utimately be determined by a jury, *see Acushnet II, supra* note 1, and this Court expresses no opinion thereon. Finally, as noted, *see supra* note 9, the Court cautions that the meaning of the terms used in this graph do not necessarily correspond to the meaning conferred on them by an alleged polluter and its insurer in the context of the insurance contract between them.

11. The nuance of the parties' theory is best set forth by way of example. The sovereigns may attempt to recover for the additional expense incurred by New Bedford lobsterers since the time they were forced, by PCB pollution, to lobster outside the harbor. Assuming, for example, that a lobster boat incurred additional costs of $50.00 per day prior to enactment to lobster outside the harbor, and that that additional cost jumped to $60.00 per day on enactment day, the parties' theories would dictate the following recoveries for natural resource damages. The sovereigns would award damages of $50.00 per day until enactment, jumping to $60.00 per day from enactment on. Aerovox would award only $10.00 per day (the incremental difference between $50.00 per day before enactment and $60.00 per day thereafter) and only from enactment day on. The Court, as will be explained, holds that no recovery is proper before enactment day, but that from enactment day forward the proper recovery is $60.00 per day.

Armed with the definitions and graph, the Court can now attempt to construe the statute and apply it to the facts of this case, to the extent such facts are known.

■ As a threshold matter, even if the sovereigns prevail upon the liability issues, it is unclear to what extent they will be able to recover natural resource damages that occurred prior to the governmental closing of the Harbor in 1978. In an unrelated motion, the sovereigns moved to exclude evidence of the effects of PCBs on fish and aquatic life. In support of that motion, they have represented to the Court that they do not intend to show that the health or reproduction of fish and aquatic life in the Harbor has been affected by the PCBs. It is their position that injury occurs when the fish and aquatic life is contaminated with PCBs above the 2.0 parts per million tolerance level set by the United States Food and Drug Administration (the "FDA"). It is at that stage that, according to regulation, 21 C.F.R. sec. 109.30(a)(7), marine life is unfit for human consumption and the Harbor has to be closed for fishing. In other words, as long as the level of PCB contamination exceeds the FDA tolerance level, individuals cannot eat the fish and other seafood regardless of whether the organisms themselves are actually harmed or harmful. Accordingly, the sovereigns argued that evidence of actual harm to marine life is irrelevant.[12] The Court allowed the sovereigns' motion provided that the sovereigns themselves do not attempt to prove damages beyond those associated with closing the Harbor due to contamination in excess of the FDA tolerance level.

This Court rules that there cannot be any damages cognizable under CERCLA before the Harbor was closed unless the sovereigns introduce evidence of the monetary quantification which proximately stems from PCB injury to the environment. Evidence of such harm may well exist. For example,[13] the Court notes that lobsterers voluntarily ceased lobstering in an area of the Harbor as early as 1977. Thus, any added expense they incurred in sailing outside their usual lobstering grounds constitutes actual harm that occurred prior to (as well as after) the closure of the Harbor to lobstering and fishing by the Massachusetts Department of Public Health on September 25, 1979. Clearly, once the Harbor was governmentally closed, putative pre-enactment damages existed at least in the form of these higher costs from that date until enactment.

■ More generally, the Court holds that, where natural resource damages are readily divisible, the sovereigns cannot recover for such damages incurred prior to enactment. This rule flows logically from the above definitions and is best explicated by further consideration of the lobsterers' example. Since 1977, the sovereigns allege that, due to the Harbor's PCB contamination, New Bedford lobsterers have been forced out of their old lobstering grounds and have had to sail farther out from port

12. The sovereigns also moved to exclude evidence challenging the validity of the FDA regulation and opposed Aerovox's motion *in limine* to exclude evidence of the FDA tolerance level. The Court rules that evidence challenging the validity of the FDA regulation will be excluded and evidence of the tolerance level as established by the FDA will be admitted on a proper foundation. Evidence regarding validity is excluded because, as a practical matter, the regulation prevents the commercial exploitation of fish and seafood that exceeds the tolerance level regardless of whether the regulation is appropriate. If Aerovox disputed the regulation itself, its remedy was to take part in the FDA rulemaking procedures, not to launch an attack against the regulation in these proceedings. *Cf. Acushnet IV, supra* note 1, at 1032 (observing that the remedy of defendants who found that the SARA amendments left them facing greater liability than their pro rata shares lay with Congress, not the court) (quoting *City of New York v. Exxon Corp.,* 697 F.Supp. 677, 694 [S.D.N.Y. 1988]).

13. In view of what follows in this opinion—i.e., limiting recovery for the lobsterers' economic damages to the post-enactment period—this example must be considered pure dicta. The parties have suggested no example of PCB harm which could not readily be divided into pre- and post-enactment portions. Because full recovery for indivisible harm is at least theoretically possible, however, it seems to the Court important to point out that, even if such indivisible harm exists (a point on which this Court expresses no opinion), prior to the closing of the Harbor such recovery is limited to proof of monetary quantification of PCB injury to the environment.

along the coast in order to ply their trade. The lobsterers thus have incurred damages, one imagines, in the form of greater fuel expense, labor costs, engine maintenance, and so on due to the longer trips to their pots.[14] Such economic harm is readily divisible because such added expenses can be calculated on a daily basis. As a result, "such damages [figured through December 10, 1980] and the release of a hazardous substance from which such damages resulted [did occur] wholly before" the enactment date. Additional damages—the added expenses from enactment date forward—are damages that have not occurred wholly before the enactment date and are recoverable. Similarly, the added costs of disposing of Harbor dredge spoils, if incurred prior to enactment, are not recoverable, whereas such added costs incurred after enactment are recoverable.

In cases where the natural resource damages are not divisible and the damages or the releases that caused the damages continue post-enactment, the sovereigns can recover for such non-divisible damages in their entirety. For example, aesthetic injury[15] to the Harbor may prove to be a compensable portion of natural resource damages. *E.g., Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1288 n. 34 (D.Del.1987) (holding that natural resource damages may be measured, *inter alia,* as the decrease in economic and aesthetic value of the resource), *aff'd on other grounds,* 851 F.2d 643 (3d Cir.1988);

*Bunker Hill,* 635 F.Supp. at 675–76 (D.Idaho 1986). It may well be that at no point in time will the sovereigns or any individual ever pay out any money to repair certain types of aesthetic injury or such injury may be impossible to repair. Yet such injury clearly results from both the pre- and post-enactment releases in an indivisible fashion and continues after enactment indivisibly as a result of the injury that was present prior to enactment. While the problems of proving such matters are not insignificant, it may well be that monetary damages should be awarded for such injury.[16]

As a final note, certain damages may be latent. That is, such damages may not yet have occurred, in the sense that no party has incurred expense because of them, at the time a damages award, if any there be, is made in this case. For example, if the sovereigns prove that the value of property adjacent to the Harbor declined due to PCB contamination of the Harbor, then the actual impact of the damage occurs at the time various parcels of land are sold and the loss is incurred. Thus, recovery is not permitted for the loss on property sold prior to enactment, but is permitted on property sold after enactment, and also on property which still has not changed hands since the contamination of the Harbor because the latent damages those properties have incurred will occur at some as yet unde-

14. The sovereigns may recover for this type of damage under the "lost use" approach to natural resource damages. *See Acushnet II, supra* note 1, at 999, 1000.

15. The Court uses the term "aesthetic injury" to describe pollution that mars the physical appearance of a natural resource, or in some other manner offends the senses, for example, by a foul stench. Also included in that term is pollution that contaminates a natural resource or otherwise renders it less than pristine or less than it was prior to release. Further, while the Court does not rule definitively on this issue, it notes the possibility of what have been termed "existence" and "intrinsic" values attributable to natural resources. Those values also may be injured. *See* Anderson, *Natural Resource Damages, Superfund and the Courts,* 16 B.C. Envt'l Aff.L.Rev. 405 (1989); Cross, *Natural Resource Damages Valuation,* 42 Vand.L.Rev. 269 (1989).

16. Thus, the Court's interpretation of subsection 107(f) would not have eviscerated a portion of superceded subsection 112(d) as does Aerovox's interpretation. *See supra* note 8. This is so because a claim for non-divisible injuries like aesthetic injuries must be made, as subsection 112(d) formerly provided, "within three years of the discovery of the loss or December 11, 1980, whichever is later." The discovery of that "loss" may well have been made prior to enactment and the damages arising from that loss would nevertheless be recoverable as the foregoing discussion in the text demonstrates. Thus the language, "within three years from … December 11, 1980," still has meaning because that formulation still produces the later date under certain circumstances.

termined time, but definitely after enactment.

### III.

■ The parties also disagree concerning which side bears the burden of proving whether natural resource damages are recoverable in light of the subsection 107(f) bar.[17] Aerovox argues that proof that the damages occurred post-enactment is an element of a natural resource damages claim and thus must be proved as part of the sovereigns' case. The sovereigns argue that subsection 107(f) is an exception to the general retroactive scheme of CERCLA. As such, the defendants would have the burden of proving what damages are retroactive and therefore within the exception.

No court has addressed this precise issue.[18] As noted above, however, courts have uniformly held that the entire purpose and remedial scheme of CERCLA is retroactive. Accordingly, a provision limiting relief to prospective damages is more appropriately interpreted as an exception to the statute. *Cf. Northeastern Pharmaceutical*, 810 F.2d at 747–48 (interpreting the "not inconsistent with the national contingency plan" provision of 42 U.S.C. sec. 9607[a][4][A] to place a burden on defendants to show that response costs incurred by the United States are inconsistent with that plan); *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578–79 (D.Md.1986) (placing the burden on the defendant bank to prove it came within an exception to the CERCLA definition of "owner or operator" and thus was free

from liability); *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1394–95 (D.N.H.1985) (same as *Northeastern Pharmaceutical*).[19] It is a basic principle of statutory construction that the party wishing to come within the statutory exception bears the burden of proof. *E.g., United States v. First City Nat'l Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967); *Ottati & Goss*, 630 F.Supp. at 1394–95. Such a result is also in keeping with Congress' intent to keep potentially responsible parties liable for the pollution they create.

Placing the burden of proof in this fashion does not violate due process, for:

"[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."

*Northeastern Pharmaceutical*, 810 F.2d at 733 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 [1976] [citations omitted]); *see also Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (holding that due process is satisfied "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose").

Aerovox has failed to show that Congress has acted in an arbitrary and irrational manner. Congress intended to impose broad liability for pollution caused by

---

**17.** Before that question is reached, however, it must be determined whether the damages in question are response costs or natural resource damages. Only with respect to damages falling under the latter category is the burden of proof issue regarding whether the damages are divisible reached.

**18.** The *Bunker Hill* court heard argument on the burden of proof issue but explicitly left it for another day. 635 F.Supp. at 675.

**19.** Aerovox contends that the burden of proof must be placed on the sovereigns, because to place it on Aerovox would mean that the sovereigns need not prove a causal link between Aerovox's releases and post-enactment damages. This interpretation would make the subsection

107(f) provision appear to be less an exception to the statutory scheme and more an integral element of the sovereigns' *prima facie* case on which, of course, they would bear the burden.

Aerovox's argument founders on a faulty premise. The Court's holding in no way eliminates the burden on the sovereigns to satisfy the burden of its *prima facie* case by establishing a causal link between releases and injury to natural resources and between those injuries and damages. Rather, once those links are established, the burden then shifts to Aerovox to prove, if it can, that particular natural resource damages occurred prior to enactment and thus fall within the statute's exemption.

the disposal of hazardous substances. *See Northeastern Pharmaceutical,* 810 F.2d at 733; *Ottati & Goss,* 630 F.Supp. at 1398; *Shell Oil,* 605 F.Supp. at 1073. In enacting subsection 107(f), Congress limited liability for natural resource damages (and only natural resource damages) because of the potentially "staggering claims" that could otherwise result, *Artesian Water Co. v. New Castle County,* 851 F.2d 643, 650 (3d Cir.1988),[20] but otherwise attempted to spread the cost of compensating for the pollution of this country's natural resources fairly among those who have contributed to the damage. While Aerovox may or may not be correct that Congress could have conceived of a "fairer" scheme, that is not the question before this Court. The compensatory scheme set out in section 107 is rational and therefore does not offend due process. Thus, just as CERCLA's retroactive nature with respect to response costs does not offend due process, *e.g., Northeastern Pharmaceutical,* 810 F.2d at 733; *Shell Oil,* 605 F.Supp. at 1072–73; *United States v. South Carolina Recycling and Disposal, Inc.,* 20 E.R.C. 1753, 1761–62 (D.S.C.1984), neither does it with respect to natural resource damages.

### IV.

Accordingly, for the reasons stated above, the motion of Aerovox for partial summary judgment is ALLOWED to the extent of ruling that, at most, Aerovox can be held liable only for damages occurring post-enactment, whether those damages derive from either pre-enactment or post-enactment releases or both. The motion is otherwise DENIED. Further, Aerovox bears the burden of proving what portion of damages caused by its releases are excluded from liability pursuant to subsection 107(f).

---

**20.** *See also Developments in the Law—Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1565 (1986).