**In re ACUSHNET RIVER & NEW BEDFORD HARBOR: PROCEEDINGS RE ALLEGED PCB POLLUTION.**

**Civ. A. No. 83–3882–Y.**

United States District Court,
D.Massachusetts.

Oct. 12, 1989.

See also 722 F.Supp. 888.

---

Ellen M. Mahan, William D. Brighton, Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., Martha Sosman, Chief, Civ.Div., U.S. Attys. Office, Boston, Mass., for U.S.

Lee Breckenridge, Chief, Nancy Preis, Asst. Attys. Gen., Environmental Protection Div., Dept. of the Atty. Gen., Boston, Mass., for Com. of Mass.

Charles C. Bering, Office of Regional Counsel, U.S. EPA–Region I, Boston, Mass., Alice Crowe, OECM–Waste, LE 134S, U.S. EPA Headquarters, Washington, D.C., for U.S. E.P.A.

Hugh Schratwieser, Office of Gen. Counsel, Washington, D.C., for Nat. Oceanic and Atmospheric Admin.

Daniel J. Gleason, Mary K. Ryan, Brian T. Kenner, Nutter, McClennan & Fish, Boston, Mass., for AVX Corp.

Paul B. Galvani, Roscoe Trimmier, Jr., Ropes & Gray, Boston, Mass., for Aerovox, Inc.

David A. McLaughlin, Michael J. McGlone, McLaughlin & Folan, New Bedford, Mass., for Belleville Industries, Inc.

Verne Vance, Jr., Richard W. Benka, Foley, Hoag & Eliot, Boston, Mass., for Cornell Dubilier Electronics Co., Inc.

John R. Quarles, Howard T. Weir, Morgan, Lewis & Bockius, Washington, D.C., for Federal Pacific Elec. Co.

Robert J. Muldoon, Jr., Daniel B. Winslow, Barbara O'Donnell, Sherin & Lodgen, Boston, Mass., for Aerovox, Inc. (Ins. Litigation).

William M. Savino, Gary D. Centola, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., Cynthia J. Cohen, Michael B. Bogdanow, Meehan, Boyle & Cohen, Boston, Mass., for Firemen's Fund Ins. Co.

James L. Ackerman, Day, Berry, Howard, Boston, Mass., Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for Aetna Cas. and Sur. Co.

John P. Ryan, Sloan & Walsh, Boston, Mass., for Hartford Ins. Co.

Michael S. Greco, Lisa D. Campolo, Hill & Barlow, Boston, Mass., Timothy C. Russell, T. Andrew Culbert, Drinker, Biddle & Reath, Washington, D.C., for Lumbermen's Mut. Cas. Co. and American Motorists Ins.

Stephen J. Paris, Michael F. Aylward, Morrison, Mahoney & Miller, Boston, Mass., for CNA Ins. Co. and Reliance Ins. Co.

Roger E. Warin, Stephen A. Fennell, Anita G. Raby, Steptoe & Johnson, Washington, D.C., for Highlands Ins. Co.

Wm. Gerald McElroy, Jr., John T. Harding, Jr., Zelle & Larson, Waltham, Mass., for Employers Ins. of Wausau.

James P. Whitters, III, Gaston & Snow, Boston, Mass., for Liberty Mut. Ins. Co.

Bert J. Capone, Deborah S. Griffin, Peabody & Arnold, Boston, Mass., for Home Ins. Co. and Lexington Ins. Group.

Robert F. Corliss, Robert A. Romero, Jr., Corlis & Romero, Boston, Mass., Mary Ann D'Amato, Paul Moran, Mendes & Mount, New York City, for Underwriters at Lloyd's.

Pamela C. Slater, Allan E. Taylor, Taylor, Anderson & Travers, Boston, Mass., for First State Ins. Co.

Timothy P. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for Mission Ins. Co.

Calum B. Anderson, Parker, Coulter, Daley & White, Boston, Mass., for Northbrook Excess & Surplus Ins. Co.

Carl K. King, Gayle M. Merling, Goldstein & Manello, Boston, Mass., for EPEC, Inc.

Erik D. Olson, Counsel, Nat. Wildlife Federation, Washington, D.C., for Nat. Wildlife Federation.

David P. Rosenblatt, Burns & Levinson, Boston, Mass., for Plating Technologies.

## MEMORANDUM ON FEDERALLY PERMITTED RELEASES [1]

YOUNG, District Judge.

Before the Court are three motions concerning releases of polychlorinated biphenyls ("PCB's") by two of the defendants in these matters, Belleville Industries, Inc. ("Belleville") and Aerovox, Inc. ("Aerovox"). In the first motion, AX–13, Aerovox seeks partial summary judgment with respect to the sovereigns' claim for natural resource damages because, it argues, its releases were federally permitted by an Environmental Protection Agency ("EPA") permit issued pursuant to Section 402 of the Clean Water Act.[2] 33 U.S.C. sec. 1342. As such, Aerovox argues, subsection 107(j) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") denies a remedy for such permitted discharges. 42 U.S.C. sec. 9607(j) (providing that "[r]ecovery by any person [including the United States or any state] for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section").

While much is disputed in these motions —e.g., whether the discharges into the New Bedford sewer system, discharges resulting from storm water runoff, and discharges via the South Trough and the transite pipe are shielded from CERCLA liability by subsection 107(j)—Aerovox does not appear to dispute that any discharges originating from rusting capacitors placed on the tidal mud flats[3] of the Aerovox facility are not federally permitted. See Supplemental Memorandum of Aerovox Incorporated With Regard to Federally Permitted Releases (Docket # 1209) at 4–5. Aerovox does, however, deny that the sovereigns have set forth any facts showing that any PCB's have migrated from the capacitors off the property of the facility since October, 1978 when Aerovox purchased the facility or that, if such migration occurred, such non-federally permitted PCB's were

---

**1.** This memorandum continues the discussion of the pre-trial issues raised in these partially consolidated cases. It is intended to be read in conjunction with the Court's earlier decisions concerning jurisdiction and parties, *In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 675 F.Supp. 22 (D.Mass. 1987) (*"Acushnet I"*); the right to jury trial, *In Re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 994 (D.Mass.1989) (*"Acushnet II"*); successor liability, *In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 1010 (D.Mass.1989) (*"Acushnet III"*); partial settlements, *In re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 1019 (D.Mass.1989) (*"Acushnet IV"*); and natural resource damages under CERCLA, *In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 716 F.Supp. 676 (D.Mass.1989) (*"Acushnet V"*).

The Court publishes this memorandum with some diffidence as the conclusions reached herein concerning the burden and elements of proof with respect to the issue of federally permitted releases are more in the nature of a tentative working hypothesis for the conduct of these related trials than a definitive ruling. That ruling must necessarily await the development of a complete record. Due to the paucity of decided cases on these issues, however, the Court authorizes publication of this memorandum in order that it may be subjected to the critique of the developing case law as well as scholarly criticism and thereby aid in their final resolution.

**2.** The Court notes that the term "federally permitted releases" as used by the parties appears to be a handy shorthand expression, but something of a misnomer. The defendants argue that a federal permit not only takes outside of CERCLA's reach those releases which are expressly allowed by the permit, but indeed any other release of PCB's at the facility that come within the purview of the permit as well, citing the definition found in section 101(10)(A–C), 42 U.S.C. sec. 9601(10)(A–C) in support. The defendants do not claim that this latter type of release is federally permitted in the sense that the sovereigns have no recourse to punish a facility owner that exceeds its permitted discharge level. Rather, the sovereigns' remedy is pursuant to the law governing the permit program, not CERCLA. Thus, a release may be federally permitted and thus outside the reach of CERCLA, but punishable under the permit program. The Court expresses no opinion on this argument in the present opinion, deferring its resolution until a further pre-trial conference.

**3.** The Court understands the parties to mean, by the term "tidal mud flats," that portion of land between the high and low water marks.

distinguishable from any permitted PCB's and caused a unique, severable harm to the natural resources. *See* Memorandum of Aerovox Incorporated In Support of Its Motion for Summary Judgment With Respect to Federally Permitted Releases (Docket #769) at 33.

■ This Court rules that the sovereigns have set forth evidence of genuine issues of material fact sufficient to survive summary judgment.

First, there is evidence that defective capacitors containing PCB's were dumped on the tidal mud flats portion of the facility by employees of (at least) defendant AVX Corporation[4] in the 1950s and 1960s and that such capacitors have rusted and corroded over time, releasing PCB's into the water and the sediments. *See, e.g.,* Belleville's Responses to Requests for Admissions ("Belleville's Responses"), Nos. 1076–78; 1089–90, 1092–93; Aerovox's Responses to Requests for Admissions ("Aerovox's Responses"), Nos. 1076–78; 1089–93, 1100; Deposition of Clifford Tuttle ("Tuttle

Dep.") at 3–43–44, 3–56.[5] Indeed, by 1981 there is evidence that, while Aerovox owned the facility, some capacitors remained whole, although rusted, while others appeared to have largely disintegrated. *See* Belleville's Responses, No. 5376.

It is a fair inference that, on the present record, when these capacitors rust through, some PCB's escape directly into the water column while others escape into the sediments. As for the latter type of release, studies conducted by the sovereigns indicate that PCB's in sediment taken from the mud flats leach into the water column to varying degrees in the presence of either agitated or quiescent water. Attachment V.C. RA5–006 to Sovereigns' Requests for Admissions No. 1661. The fair inference from this evidence is that nonfederally permitted PCB's from the dumped capacitors have been escaping and continue to escape from rusted-through capacitors into the water column during Aerovox's ownership, either directly or via sediments.[6] Thus,

---

**4.** At the time, AVX Corporation was known as Aerovox Corporation.

**5.** The Court acknowledges that Aerovox denies any PCB's have been released from any part of the facility during its ownership.

**6.** This Court notes, but does not resolve, the dispute whether a release into the sediments of the mud flats equals a release into the environment as is required by CERCLA for liability. *See* 42 U.S.C. sec. 9601(22); 42 U.S.C. sec. 9607(a)(4). Whatever the status of the mud flats sediments, the water column itself, clearly not a part of the facility, is a part of the environment. Thus, for the purposes of this opinion, it is sufficient that it may be inferred that PCB's escape from the capacitors into the water column either directly or via the sediments of the mud flats.

While the parties have not raised the point, the Court notes that one might argue that the only release involving a given capacitor and its PCB's occurred when the capacitor was dumped on the mud flats. That argument runs as follows: a release is defined as, *inter alia,* "the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant." 42 U.S.C. sec. 9601(22). Assuming a capacitor is such a container or closed receptacle and that the mud flats, although part of the plant property, constitute "the environment" within the meaning of subsection 9601(22), one

could construe the dumping of a capacitor by a defendant on the mud flats as an abandonment or discarding into the environment. One could then further assert that the company that released that capacitor and its PCB's is the only company that can be liable for the injury caused by such PCB's.

Assuming—and it is a major assumption—that the factual and legal underpinnings exist to support the argument just made, this Court rules that Belleville and Aerovox would still be liable for the injury caused by the PCB's that leaked out of the abandoned capacitors while each owned the plant. Conceptually, this result may seem problematic: how can something already in the environment (the PCB's in the abandoned capacitors) leak into the environment? One could attempt a metaphysical exercise describing the container as being in the environment while the PCB's were merely inside the container. A more honest solution to the problem centers on CERCLA's extraordinarily broad remedial purpose and its legendarily inartful drafting. *See Acushnet V,* 716 F.Supp. at 681 n. 6 (and cases cited). Based on these two considerations, this Court rules that—in the situation outlined above—Congress intended to expand the scope of liability by stating that "release" meant, in addition to readily apparent incidents of pollution like leaking, spilling, and leaching, less intuitively clear incidents of pollution like the abandonment of containers. That is, Congress intended to increase the scope of liability to reach the party that dumped the containers

these capacitors seem likely to account for at least a portion of the PCB's in the sediments of the mud flats and the waters of the New Bedford Harbor (the "Harbor").[7]

Admittedly, it is undisputed that some PCB's in the Harbor came from federally permitted releases. The sovereigns do not appear to dispute that some, if not all, of the PCB's discharged through the North Trough after December 30, 1976 are federally permitted releases. Nevertheless, if the sovereigns establish at trial that nonfederally permitted releases by Aerovox were a contributing factor[8] to an injury to natural resources and produce evidence that the injury is indivisible, Aerovox will be jointly and severally liable for all the resulting injury unless it can prove that the injury is divisible.[9] *O'Neil v. Picillo*, 883 F.2d 176, 178–179 (1st Cir.1989). *See United States v. Monsanto Co.*, 858 F.2d 160, 172 (4th Cir.1988) (holding that the burden

of proving divisibility in a CERCLA action is on the defendants); *United States v. Tyson*, No. 84–2663 (1988 WL 7163 at 4) (E.D. Pa. Jan. 29, 1988) (same); *United States v. Chem–Dyne*, 572 F.Supp. 802, 810 (S.D.Ohio 1983) (same).

The present record does not reveal whether the nonfederally permitted releases from the capacitors on the tidal mud flats alone (or indeed in combination with the various other PCB's released by Belleville or Aerovox, the permitted or unpermitted nature of which is disputed) constitute a contributing factor to an indivisible harm. While Aerovox correctly points out that this is a matter on which the burden of proof is borne by the sovereigns (with the exception of the divisibility issue),[10] upon the current state of the record this Court is nonetheless left to speculate to what extent the existence of the federally permitted releases will absolve Aerovox from liability.[11] In such circumstances, the better

7. As in the Court's previous opinions on this matter, *see supra* note 1, the term "Harbor" herein refers to both the Acushnet River Estuary and the New Bedford Harbor itself.

8. In its original draft of this opinion, this Court followed the Restatement (Second) of Torts sec. 433B and was prepared to opine that the sovereigns had to prove that the releases by Aerovox were a "substantial" contributing factor before joint and several liability would attach. The First Circuit has recently eschewed this approach and it is now clear that "substantiality" plays no role in the determination of joint and several liability. *O'Neil v. Picillo*, 883 F.2d 176, 179 n. 4 (1st Cir.1989).

9. With respect to divisibility of the injury, then, the sovereigns must first meet a burden of production—introducing evidence sufficient to warrant a fact finder's conclusion that the injury was indivisible. That accomplished, the defendant bears the burden of persuasion that the injury and its attendant damages can be apportioned. May 21, 1987 Transcript at 7; May 22, 1987 Transcript at 4. This Court acknowledges that neither the Restatement (Second) of Torts nor the decided CERCLA cases explicitly require the plaintiff in a tort or CERCLA case to

notwithstanding the containers' integrity at the time of abandonment. Congress did *not* intend to release from liability those who later owned the facility while further injury to the environment, in the form of continued leaking of hazardous substances from corroding containers, occurred.

come forward with evidence sufficient to establish the indivisible nature of an injury. However, such a requirement is not inconsistent with any of these authorities and fairly seems implicit in them.

The treatment of the divisibility issue here should not be confused with this Court's treatment of a different divisibility issue in its opinion on pre- and post-enactment natural resource damages. There, the Court considered the appropriate burdens of proof at the point in time where the sovereigns have established that the defendants are liable, whether jointly *and* severally or only severally, for damages and the defendants' wish to assert that some of these damages occurred pre-enactment and are therefore not recoverable pursuant to the exception found in CERCLA subsection 107(f)(1). 42 U.S.C. sec. 9607(f)(1). In that case, because it is a statutory exception, the burdens of production and persuasion fall on the defendants to establish that any damages for which they are otherwise liable fall within it. A third divisibility issue in this case concerns the apportionment of injury between that caused by federally permitted releases and that caused by non-federally permitted releases. *See infra* at 900–01 & n. 20.

10. *See supra* note 9.

11. Federally permitted releases can absolve a defendant from liability primarily in the sense that, while all the PCB releases by the defendant may amount to a contributing factor, the nonfederally permitted PCB releases alone may not. Thus, the defendant would not be jointly and

part of valor seems to be to withhold definitive legal exposition of such factually based issues until a complete record has been developed at trial.[12] Aerovox's motion for partial summary judgment, AX–13, will therefore be denied.

In the second motion before the Court, US–18, the sovereigns seek, *inter alia*, partial summary judgment with respect to Belleville's Eleventh, Thirteenth and Fifteenth defenses which also essentially invoke subsection 107(j). It is clear to this Court on the present record that (i) as previously observed, some PCB's in the Harbor are federally permitted and (ii) that a genuine issue of material fact exists whether non-federally permitted PCB discharges (the capacitor-related releases) occurred during Belleville's ownership of the facility. With respect to the latter point, the Court rules that a fact finder could conclude that in 1981, less than three years after Belleville had sold the plant, some of the capacitors dumped on the mud flats in the 1950's and 1960's were found to have disintegrated while others, although rusty, remained whole. This conclusion, in turn, supports the inference that PCB's originating in capacitors were released from the capacitors or sediments of the mud flats into the water column during Belleville's ownership.

As previously noted, a further genuine issue of material fact exists: whether any non-federally permitted releases that may eventually be established amount to a contributing factor to the injury. If the answer to this question is yes, a further question arises: Is the injury indivisible, thus giving rise to joint and several liability? *See* May 21, 1987 Transcript at 5–8. This question is unanswerable on the present record. Thus, these federally permitted release defenses survive to the extent that classification of Belleville's releases into federally permitted and unpermitted categories may possibly save Belleville from liability, joint and several or otherwise.[13] Accordingly, US–18, to the extent it seeks summary judgment on Belleville's federally permitted release defenses, is denied.

In US–18, the sovereigns also seek summary judgment with respect to Belleville's Tenth and Twelfth Defenses. Belleville's Tenth Defense states:

At all times material hereto, the defendant Belleville Industries, Inc.'s alleged actions which are the subject of the Amended Complaint were conducted under license or licenses granted by the Commonwealth of Massachusetts.

Answer of the defendant Belleville Industries, Inc. to the First Amended Complaint ("Belleville's Answer") (Docket # 22) at 12.

Belleville's Twelfth Defense states:

In performing any alleged act or acts set forth in the Amended Complaint, the defendant Belleville Industries, Inc. was duly authorized by the Commonwealth of Massachusetts.

*Id.*

Despite the fact that this is a motion by the sovereigns for summary judgment, this Court finds itself unable to ascertain the exact nature of the defenses being asserted

---

severally liable. In fact, it would not be liable at all. *See, e.g., New Jersey Environmental Protection Dept. v. Ventron Corp.*, 182 N.J.Super. 210, 440 A.2d 455, 463 (1981), *aff'd as modified*, 94 N.J. 473, 468 A.2d 150 (1983) (affirming a dismissal of an action against defendants whose small contribution to the total pollution involved in the case was "de minimis and, therefore, not a factor in proximately causing the total dangerous and toxic condition"); *Restatement (Second) of Torts*, sec. 431 (1965). In this sense, and this sense only, this Court recognizes a *de minimis* defense as the obverse of the causation question. To the extent the Court's previous order striking Belleville's Forty-seventh Defense in its ruling on US–18 is contradictory to this ruling, today's opinion obtains and that order is vacated.

**12.** Implicit in this ruling is the premise that, should it be established at trial that federally permitted PCB releases by any defendant or defendants would have alone accounted for all the damage to the Harbor (*e.g.*, by alone accounting for PCB concentrations in fish and aquatic life greater than two parts per million, 21 C.F.R. sec. 109.30[a][7] ), Aerovox and any other defendant would still be liable for any injury to which their non-federally permitted releases constituted a contributing factor, with one possible exception: it is unclear at present to the Court what follows if federally permitted releases alone accounted for enough pollution to close the Harbor prior to the enactment of CERCLA.

**13.** *See supra* notes 11–12.

herein. Given that the permit underlying the federally permitted release defense may be issued either by the federal government or, in certain circumstances, by a state, see 33 U.S.C. sec. 1342, these defenses may simply restate the federally permitted release [14] defense pled in the Eleventh, Thirteenth and Fifteenth Defenses. If that is so, the preceding resolution of those defenses applies equally to these.

■ It may be, however, that Belleville seeks in its Tenth and Twelfth Defenses to raise a different barrier to the sovereigns' case. Belleville may be asserting that, because the Commonwealth issued it some license other than one pursuant to 33 U.S.C. sec. 1342 or otherwise duly authorized its discharges of PCB's, the Commonwealth is estopped from seeking any recovery under CERCLA. Should this be the case, the sovereigns should be granted summary judgment on the defenses with

respect to the natural resource damages case because such equitable defenses cannot be defenses to the sovereigns' natural resource damages claims which are legal in nature. July 30, 1986 Transcript at 99, 101. The Court reserves judgment on their viability with respect to the clean-up aspects of this matter.[15]

As to what else, if anything, may lurk in these cryptic defenses, this Court does not hazard a guess. Nor should the Court be required to guess in the context of a summary judgment motion at this advanced stage of the litigation. Rather, the Court rules that the sovereigns are granted summary judgment on Belleville's Tenth and Twelfth Defenses, except to the extent that they attempt to raise a federally permitted release defense vis-a-vis the Commonwealth or an equitable defense with respect to the clean-up aspect of this case.[16]

**14.** Because a state may permit a release, the term "federally permitted releases" seems to be a misnomer for a second reason. See supra note 2.

**15.** The Court does note that serious doubt exists whether equitable defenses can be maintained against the sovereigns, at least in some circumstances that may be pertinent here. See Phelps v. Federal Emergency Mgt. Agency, 785 F.2d 13 (1st Cir.1986) (denying federally insured plaintiffs insurance benefits because, relying on the representations of federal employees that it was unnecessary, the plaintiffs failed to provide a written proof of loss and refusing to permit the plaintiffs to estop the defendant federal agency, because of its employees' actions, from raising the plaintiffs' failure to provide such written proof as a defense); United States v. Ven-Fuel, Inc., 758 F.2d 741, 761 (1st Cir.1985) (holding that the doctrine of equitable estoppel does not apply fully against the government because the possibility of harm to a private party is often, if not always, grossly outweighed by the public interest in enforcement of congressionally mandated public policy); United States v. Stringfellow, 661 F.Supp. 1053, 1062 (C.D.Cal.1987) (striking equitable defenses to liability in a CERCLA case because such defenses "cannot be asserted against the government when it acts in its sovereign capacity to protect the public health and safety"); but see United States v. Mottolo, 695 F.Supp. 615, 626–27 (D.N.H.1988). The Court also notes that courts and commentators are divided on the issue whether any defense other than those specifically enumerated in CERCLA, subsection 107(b), 42 U.S.C. sec. 9607(b), can ever be maintained. Compare Mottolo, 695 F.Supp. at 626–27 (permitting equitable

defenses to be raised); Developments in the Law: Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1550 (1986) (arguing that "the 'subject only' clause [in section 107] was primarily intended to exclude defenses based on the absence of negligence" and therefore that numerous defenses other than those listed in section 107[b] are available) with Stringfellow, 661 F.Supp. at 1062 (not permitting equitable defenses to be raised).

**16.** Turning to a final issue raised by US–18, the Court strikes Belleville's defenses, e.g., the Fifty–Seventh Defense, which rely on Chapter 18 of the Massachusetts Acts of 1806. That statute gave riparian land owners in New Bedford the right to build wharfs from the low water mark of their properties out to the Harbor channel. Belleville asserts that, to the extent that the company has a property interest in those sediments and the water over them, any recovery won by the sovereigns should be thereby diminished. See Opposition of the Defendant Belleville Industries, Inc. to the Plaintiffs' Motion for Partial Summary Judgment As to Certain Defenses Asserted by Belleville Industries, Inc., and Motion to Exclude Evidence at the Upcoming Trial and Brief in Support of Said Opposition at 50–52.

Although Belleville dredges up some murky language from three Supreme Judicial Court decisions from the last century interpreting this statute, Haskell v. City of New Bedford, 108 Mass. 208 (1871); Hamlin v. Pairpoint Mfg. Co., 141 Mass. 51, 6 N.E. 531 (1886); and Hastings v. Grimshaw, 153 Mass. 497, 27 N.E. 521 (1891), that court's more recent decision in Boston Waterfront Development Corp. v. Commonwealth,

With respect to the third motion, US–9, the sovereigns seek summary judgment on the issue whether they incurred response costs within the meaning of section 107 of CERCLA, 42 U.S.C. sec. 9607, with respect to releases by Aerovox. This Court has earlier denied a similar motion with respect to Belleville as part of US–13 for the reason that the issue which was the subject of that motion is inextricably intertwined with the issues of causation that will be the subject of the natural resource damages trial and, as such, requires the development of a more complete record. May 22, 1987 Transcript at 7. The Court denies the instant motion for similar reasons.

First, the sovereigns have failed to show, as this Court rules they must, that the response costs they say they incurred were caused by a release, or a threatened release, from the Aerovox facility while Aerovox owned it.[17] *See, e.g., Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152 (9th Cir.1989); *General Elec. Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949, 957 (W.D.Mo.1989); *Dedham Water Co. v. Cumberland Farms, Inc.,* 689 F.Supp. 1223, 1224–25 (D.Mass.1988) (and cases cited). Indeed, a genuine issue of material fact exists whether Aerovox even released PCB's.[18]

Second, even if the Court granted summary judgment on this motion, it does not appear that such a ruling, as a practical matter, would advance the case. The sovereigns appear to make this motion, not to recover response costs they allege they have incurred up to the present, but rather to satisfy what Aerovox asserts is a required element of a *prima facie* case for recovery of natural resource damages, i.e., "a release, or a threatened release [of a hazardous substance] which causes the incurrence of response costs...." 42 U.S.C. 9607(a)(4).[19] One can scarcely imagine a scenario where the sovereigns could establish that a release by Aerovox caused "injury to, destruction of, or loss of natural resources," 42 U.S.C. sec. 9607, without simultaneously establishing that a release by Aerovox caused the incurrence of response costs by the government. Thus, the

378 Mass. 629, 393 N.E.2d 356 (1979), addressing a similar statute governing such rights in Boston Harbor, must guide this Court. In that opinion, the court appears to have held that the statute conferred only the right to build a wharf in fulfillment of a public purpose. *Id.* at 646–49, 393 N.E.2d 356. Indeed, the court stated that tidal land so granted could not be retained unless used for the purpose for which it was granted. *Id.* at 648, 393 N.E.2d 356. Further, title to such land is impressed with a public trust and may be used only for a purpose approved by the legislature as a public use that will "benefit and improv[e] [the] harbor." *Id.* at 648, 393 N.E.2d 356. This public trust "gives the public's representatives an interest and responsibility in its development." *Id.* at 649, 393 N.E.2d 356.

To the extent any grant was made to Belleville's predecessors in title, it was only to build a wharf. As no wharf was ever built, or at least, as far as the record shows, no wharf existed when Belleville owned the property, Belleville failed to retain whatever grant had been made. Moreover, given the public trust impressed on this land, this Court notes the remarkable cynicism in Belleville's implicit argument that its use of such land as a dump for hazardous materials, if proven, is consistent with that trust and of benefit to the Harbor. The defenses are stricken.

This opinion concludes the Court's consideration of US–18 for the present. The motion has been ruled on definitively with the following

exceptions: the motion has been allowed with respect to Belleville's Fourteenth, Sixteenth, Seventeenth and Eighteenth Defenses only in the context of the natural resource damages aspect of this matter; the Court otherwise expresses no opinion at this time. May 22, 1987 Transcript at 34. The motion, to the extent it asks the Court to strike Belleville's Thirtieth and Thirty-first Defenses, is denied without prejudice to its renewal on a more complete record. *Id.* at 35.

17. The Court acknowledges that, because Aerovox is liable as Belleville's successor, *see Acushnet III,* 712 F.Supp. 1010, that it is conceivable that Aerovox may be found liable for response costs incurred as a result of a release from the facility while Belleville owned it.

18. In fact, this Court has previously denied the sovereigns summary judgment on this very issue. *See* Docket # 949, December 22, 1986 (denying US–2).

19. The Court acknowledges that the sovereigns "do not necessarily concede that demonstration of the incurrence of response costs is an element of their prima facie case for natural resources damages." Memorandum In Support of Plaintiffs' Motion for Partial Summary Judgment With Respect to the Incurrence of Response Costs (Docket # 969) at 1 n. 1.

sovereigns' motion for summary judgment on the issue of response costs, US–9, is likewise denied.

## CONCLUSION

For the purpose of determining these three motions and conducting further proceedings herein, but subject to further analysis and consideration, *see supra* note 1, the Court rules that the sovereigns bear the burden of proving by a fair preponderance of the evidence that releases from a particular facility while owned by a particular defendant were a contributing factor to the natural resource injury for which recovery is sought in this action. That done, a defendant is jointly and severally liable for all the injury unless it can meet its burden of proving the injury is divisible. Further, a defendant who claims exemption from or reduction of liability due to a federal permit for the release of PCB's [20] bears the burden of proving, again by a fair preponderance of the evidence, which releases were federally permitted and, if possible, what portion of the natural resource damages are allocable to federally permitted releases.[21] It is upon such an allocation of the burdens of proof that these three motions for summary judgment—AX–13, US–18, and US–9—have been resolved.

**20.** *See supra* notes 11 and 12.

**21.** The Court reaches this conclusion for two reasons. First, proving divisibility of harm is, both traditionally and in the CERCLA context, a burden of the defendant where the question is one of dividing harm among tortfeasors. Analogously, it is appropriate to place the burden of divisibility on defendants when the question is one of dividing harm between permitted and non-permitted releases.

Second, 42 U.S.C. sec. 9607(j) is in essence an exception to the general rule that recovery is permitted for natural resource damages caused by releases of hazardous substances. 42 U.S.C. sec. 9607(a). *Cf. Acushnet V,* 716 F.Supp. at 687–88 (ruling that the defendants have the burden of proving whether natural resource damages are recoverable in light of the subsection 107[f] bar against recovery for pre-enactment damages, 42 U.S.C. sec. 9607[f], because, given the fact that the entire purpose and remedial scheme of CERCLA is retroactive, a provision limiting relief to prospective damages is more appropriately interpreted as an exception to the statute); *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 747–48 (8th Cir.1986) (interpreting the "not inconsistent with the national contingency plan" provision of 42 U.S.C. 9607[a][4][A] to place a burden on defendants to show that response costs incurred by the United States are inconsistent with that plan); *United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573, 578–79 (D.Md.1986) (placing the burden on the defendant bank to prove it came within an exception to the CERCLA definition of "owner or operator" and thus was free from liability); *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361, 1394–95 (D.N.H. 1985) (same as *Northeastern Pharmaceutical*). As this Court noted in *Acushnet V:*

It is a basic principle of statutory construction that the party wishing to come within the statutory exception bears the burden of proof. *E.g., United States v. First City Nat'l Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088 [1092, 18 L.Ed.2d 151] (1967); *Ottati & Goss,* 630 F.Supp. at 1394–95. Such a result is also in keeping with Congress' intent to keep potentially responsible parties liable for the pollution they create.

716 F.Supp. at 687.

The legislative history also tends to support this view. Both the Senate Report and the remarks of Senator Randolph use the phrase "to qualify for *exemption* from liability for any federally permitted release...." *See* S.Rep. No. 848, 96th Cong., 2d Sess. 47, *reprinted in* 1 *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, P.L. 96–510* 354 (hereinafter *Legis. History*) (emphasis added); 126 Cong. Record 30,932 (November 24, 1980), *reprinted in* 1 *Legis. History* at 687; *see also* 1 *Legis. History* at 354, 688.

The argument that subsection 107(j) raises not a question of exemption but a question of jurisdiction is pure formalism signifying nothing. The sections at issue in each of the above-cited cases could likewise have been characterized either way. What is important is those cases' substantive holdings that "exemption" language in CERCLA is available only to defendants able to meet the burden of proving that they fall within it, holdings in line with the broad remedial purpose of the statute.

A final reason for placing the burden on the defendants in this matter is that to do otherwise would require plaintiffs in CERCLA actions to prove a negative as part of their *prima facie* case: *i.e.,* that no relevant federal permits were issued. While this requirement would perhaps be less troublesome where the Environmental Protection Agency were a party to the action, in other cases, where, for example, the plaintiff might be a state or a private party, the practical difficulty confronting the plaintiff of proving that subsection 107(j) does not apply would be far greater than the practical difficulty the de-

fendant would encounter in establishing the ex-   istence and effect of a relevant permit.